Kristine M. Akland
Center for Biological Diversity
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
kakland@biologicaldiversity.org

Alizabeth A. Bronsdon
Bronsdon Law Firm, PLLC
P.O. Box 7262
Missoula, MT 59807
(267) 664-3422
bronsdonlaw@gmail.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization; ALLIANCE FOR THE WILD ROCKIES, a non-profit organization; NATIVE ECOSYSTEMS COUNCIL, a non-profit organization; COUNCIL ON WILDLIFE AND FISH, a non-profit organization; and YELLOWSTONE TO UINTAS CONNECTION, a non-profit organization, <br><br>      Plaintiffs, <br><br> vs. <br><br> ERIN CAREY, in her official capacity as the Missoula Field Manager of the Bureau of Land Management; SONYA GERMANN, in her official capacity as the Montana/Dakotas State Director; | CV–24-168-M-KLD <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1

|  |  |
|---|---|
| TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; UNITED STATES BUREAU OF LAND MANAGEMENT, a federal agency,<br><br>             Defendants. |  |

## I.    INTRODUCTION

1.      Plaintiffs bring this civil action against Defendants under the citizen suit provision of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–70, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–87.

2.      On April 18, 2024, the United States Bureau of Land Management ("BLM") Missoula Field Office authorized a major logging project in the Clark Fork River sub-basin and Garnet Mountain Range east of Missoula, between Bonner and Drummond, Montana.

3.      The Clark Fork Face Forest Health and Fuels Reduction Project ("Clark Fork Face Project" or "Project") will log mature forest, destroy and fragment habitat, displace wildlife, alter hydrology, and adversely affect threatened grizzly bears, Canada lynx, bull trout, and North American wolverine in an area critical for connectivity and dispersal as wildlife populations navigate between core habitat in the Northern Continental Divide, Greater Yellowstone, and Bitterroot ecosystems.

2

4.    The Decision Notice authorizes logging on 8,283 acres (almost 13 square miles) and burning on another 4,600 acres of forest. Another 2,146 acres are authorized for "fuels management treatments," which involves reducing tree densities—in other words, logging, thinning, and burning.

5.    The Project would remove four million board feet of timber every year over the Project's 10 to 15-year lifespan.

6.    Despite the BLM's decision to treat over 70% of BLM-owned land in the planning area (16,689 of 23,666 acres), the many other landowners actively cutting and burning trees and building roads and structures within the Project area, as well as already degraded baseline conditions from heavy historical logging and mining activities, the BLM authorized the Clark Fork Face Project without properly analyzing how Project activities may impact the area's unique role as a wildlife connectivity corridor, crucial to the recovery of protected wildlife species.

7.    The BLM summarily dismissed any potential impacts from road-related Project activities to wildlife, despite inevitable increases to the volume and density of year-round motorized and non-motorized use in the planning area and the 19 miles of currently unmapped and largely unused roads that will be turned into haul routes for the Project. It is unclear whether these 19 miles of "new system roads" were included in the Project area's already high baseline road density calculations.

8.    Additionally, when discarding impacts from road building operations its

assessment, the BLM entirely failed to consider the current conditions of the system and non-system roads that the Project intends to use for hauling timber. As is clear from satellite imagery and confirmed by site visits, a significant but ultimately unknown number of miles of roads in the Project area that will be used for hauling timber are presently "impassable," meaning they have "been treated in such a manner that the road is blocked" by natural vegetation growth, road entrance obliteration, fallen trees, boulders, or other means. There is no discussion in the EA about the potential effects of re-constructing currently impassable roads.

9.     The BLM also failed to take a "hard look" at the climate impacts of removing hundreds of thousands of trees from the forest. The BLM characterized the impacts of logging these mature forests as "beneficial," ignoring years of science and agency guidance, and in doing so, failed to acknowledge or otherwise address the negative impacts related to carbon emissions caused by roadwork, burning, cutting, hauling, and processing commercial timber, including thousands of acres of mature trees.

10.     Further, the Missoula Field Office Resource Management Plan ("RMP") and the Project contradict the Canada Lynx Conservation Strategy and Assessment ("Lynx Assessment"). When analyzing the impacts of the RMP on lynx, the BLM did not explain how it defined "lynx habitat" nor did it map where lynx habitat occurs in the planning area. The RMP also exempts lynx habitat within the

wildland urban interface ("WUI") and "Fire Management Zone 1" ("FMZ 1") from compliance with lynx standards without adequately discussing how exempting these acres from conservation measures impacts lynx or disclosing that it contradicts the best available science.

11.     At the Project level, despite Garnet Range's designation as critical habitat under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44, the BLM claims there are less than 250 acres of lynx habitat in the Project area, meaning the Project exempts the vast majority of the area from lynx conservation measures. To make matters worse, the BLM also claims that all of the roughly 250 acres of lynx habitat are within the WUI and FMZ 1, thus permitting those acres to be logged. To be sure, in reaching that result, the BLM utilized an arbitrary definition of "lynx habitat" that contradicts the Lynx Assessment and best available science, which indicate that significantly more acres in the Project area qualify as lynx habitat. Further, the BLM's WUI designation at the Project level is unsupported, contradicts the WUI mapped at the RMP level, and is thus arbitrary.

12.     Finally, the Project documents do not demonstrate compliance with a number of RMP requirements, including those designed to maintain road densities and provide adequate hiding and thermal cover and security for big game, protected wildlife, and other sensitive species.

13.     Plaintiffs Center for Biological Diversity, Alliance for the Wild Rockies,

Native Ecosystems Council, Council on Wildlife and Fish, and Yellowstone to Uintas Connection attest that Defendants' decision to authorize extensive logging and burning, alongside thinning and other fuels management treatments, across 16,689 acres in the Clark Fork Face Project planning area is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

14.     Defendants' actions or omissions violate NEPA, FLPMA, and the APA by failing to take a hard look at the impacts of logging, burning, thinning, and other fuels management activities on wildlife, wildlife habitat, climate, and connectivity within the Project planning area as authorized by the Decision.

15.     As of the date of this filing, to the best of Plaintiffs' knowledge, the BLM has not yet advertised a sale under this Project. However, the Project does authorize winter logging.

16.     Because the BLM's approval of the Clark Fork Face Project violates federal law, Plaintiffs request that the Court set aside and enjoin the implementation of the Defendants' decision—and specifically enjoin any ground disturbing activities authorized by the Decision—pursuant to 5 U.S.C. § 706(2)(A) and (D).

17.     Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act ("EAJA") 28 U.S.C. § 2412, and such other relief as this Court deems just and proper.

## II.    JURISDICTION

18.    This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), and 2202 (declaratory judgment and further relief).

19.    Venue in this case is proper under 28 U.S.C. § 1391(e) and Local Rule 3.2 because Defendant Carey resides within the Missoula Division of the United States District Court for the District of Montana.

## III.    PARTIES

20.    Center for Biological Diversity (the "Center") is a non-profit organization that is dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is headquartered in Tucson, Arizona, with additional offices throughout the country, including in Montana. The Center has more than 89,000 active members, including more than 500 members in Montana, some of whom reside, recreate, and have an interest in conserving the lands and wildlife in the Clark Fork Face Project area. The Center and its members have a long-standing interest in conserving native species and have consistently advocated for the conservation and protection of native species, including the

grizzly bear, lynx and wolverine. The Center brings this action on its own behalf and on behalf of its adversely affected members.

21.    Plaintiff Alliance for the Wild Rockies (the "Alliance") is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion; its native plant, fish, and animal life; and its naturally functioning ecosystems. The Alliance's registered office is located in Missoula, Montana. The Alliance has more than 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area. The Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

22.    Plaintiff Native Ecosystems Council ("NEC") is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. NEC is dedicated to the conservation of natural resources on public lands in the Northern Rockies. In furtherance of this mission, NEC's members and supporters remain active in wildlife management, including grizzly bear, Canada lynx, and wolverine

conservation. Its members use and will continue to use the Project area for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The BLM's unlawful actions will adversely affect NEC's organizational interests, as well as its members' use and enjoyment of the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

23.    Plaintiff Council on Wildlife and Fish (the "Council") is a public interest organization (tax-exempt, non-profit) formed to insure the maintenance of biological diversity and the ecological integrity of all natural ecosystems through the enforcement and administration of laws such as the ESA, National Forest Management Act, NEPA, Clean Water Act, and all other laws that require the recognition, discussion and conservation of such ecosystems and protect the organic or inorganic components that comprise such natural ecosystems. The Council's registered office is in Bozeman, Montana. The Council's members are in Montana. They enjoy and appreciate indigenous wildlife, fish, spiritual connection and renewal, clean water, and high-quality aquatic and terrestrial habitat. Council members expect to continue these practices well into the future, including in the Clark Fork Face Project area. The Council's members' professional, spiritual and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. Council

on Wildlife and Fish brings this action on its own behalf, on behalf of its adversely affected members and on behalf of numerous, voiceless life forms eminently threatened with displacement, injury, and/or death.

24.    Plaintiff Yellowstone to Uintas Connection ("Y2U") is a non-profit organization dedicated to protecting the integrity of habitat for native fish and wildlife in the wildlife corridor that connects the Greater Yellowstone Ecosystem and Northern Rockies to the Uinta Wilderness and Southern Rockies. Members of Y2U work to restore fish and wildlife habitat in the Yellowstone to Uintas Corridor through the application of science, education, and advocacy. Y2U's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project. Y2U brings this action on its own behalf and on behalf of its adversely affected members.

25.    Plaintiffs have participated actively in available public processes concerning the Clark Fork Face Project and its effects on forests, grizzly bears, lynx, and wolverine, as well as other sensitive species and the climate crisis, including by filing extensive comments on the environmental assessments issued by the BLM for the Project, and by filing objections to the BLM's proposed Project decisions.

26.    An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Clark Fork Face Project area for hiking, fishing,

hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future. Plaintiffs' members and staff are concerned with protecting the wildlife, scenery, air quality, and other natural values of the Clark Fork Face Project area.

27.    For example, Michael Garrity, Executive Director of Alliance for the Wild Rockies and a member of the Center, lives in Montana and has spent many hours hiking and skiing in the Clark Fork Face Project area. He recently visited the Project area in September 2024 to enjoy the peace and solitude of the forest in its natural state and with the hopes of seeing wildlife. Michael enjoys being in the mature and old-growth trees within the Project area and it is special to him because it contains habitat for wolverine, lynx, and grizzly bears. He worked in the Project area as President of the Garnet Ghost Town Preservation Association in the late-1980s and has fond memories of spending long days working outside. Michael has specific plans to visit the Project area again in the summer of 2025. His ability to enjoy this area will be forever damaged by the logging and road building authorized by the Clark Fork Face Project.

28.    The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members and employees have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete

injuries caused by Defendants' failure to comply with mandatory duties under NEPA, FLPMA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

29.    Defendant Erin Carey is the Field Manager and BLM official responsible for preparing the April 18, 2024 decision rejecting many of Plaintiffs' objections to the Clark Fork Face Project. Ms. Carey is sued in her official capacity as the manager of the Missoula Field Office of the BLM, located in Missoula, Montana. 43 C.F.R. § 1601.0–4(c).

30.    Defendant Sonya Germann is sued in her official capacity as the State Director for the Montana-Dakotas BLM, located in Billings, Montana. As State Director, Ms. Germann is the federal official responsible for supervising all Montana-Dakotas BLM officials and ultimately approving the decision challenged in this case. *Id*. § 1601.0–4(b).

31.    Defendant Tracy Stone-Manning is sued in her official capacity as the national Director of the BLM. As Director, Ms. Stone-Manning is the federal official with responsibility for all BLM officials' actions and/or inactions challenged in this case. *Id*. § 1601.0–4(a).

32.    Defendant BLM is an administrative agency within the Department of Interior, and is responsible for the health, diversity and productivity of public

lands, and for applying and implementing the federal laws and regulations challenged in this case.

33.    Plaintiffs have exhausted all available administrative remedies. Plaintiffs timely submitted written comments and objections concerning the Project in the available administrative review process.

## IV.    LEGAL FRAMEWORK

**The National Environmental Policy Act**

34.    Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

35.    As a general matter, NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions. *Id*. § 4332(2)(C).

36.    To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Where an agency is uncertain whether it must prepare an EIS, it may prepare an environmental assessment ("EA") to determine whether the action may have significant impacts and thus require preparation of an EIS. *Id*. § 4336(2).

37.     In an EA, NEPA requires the agencies discuss the environmental impacts of the proposed action and alternatives, and provide sufficient evidence and analysis for determining whether to prepare an EIS or finding of no significance. *Id.*

38.     NEPA requires that agencies set an appropriate baseline which is "a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action." *Am. Rivers v. FERC*, 201 F.3d 1186, 1195 n.15 (9th Cir. 1999).

39.     An EA must identify the effects or impacts of each reasonable alternative and provide a detailed statement including "[r]easonably foreseeable environmental effects of the proposed agency action;" "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;" and "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332 (C)(i)-(iii).

**The Federal Land Policy and Management Act**

40.     FLPMA and its related regulations govern the BLM's management of lands that fall under its jurisdiction. FLPMA directs the BLM to "develop, maintain, and when appropriate, revise land use plans," 43 U.S.C. § 1712, called "resource

management plans" that "guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses" on public lands, 43 C.F.R. §§ 1601.0–1, 1601.1–2.

41.    Generally, an RMP "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004).

42.    All site-specific decisions must conform with the relevant RMP. 43 C.F.R. § 1610.5–3(a). If a proposed action is not consistent with the RMP, the RMP must be amended according to NEPA. *Id*. §§ 1610.5–3(c), 1610.5–5.

43.    The term "plan conformance," as defined in the BLM planning regulations, means either that resource management actions must be "specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan." *Id*. § 1601.0–5.

44.    Thus, although an RMP is foundational to future management decisions, it does not provide a decision as to whether to undertake or approve any specific action; such decisions require further site-specific analyses. *Norton*, 542 U.S. at 59–60; 43 C.F.R. § 1601.0–5(n).

**The Administrative Procedure Act**

45.    Because NEPA and FLPMA do not include a citizen suit provision, this case is brought pursuant to the APA. 5 U.S.C. §§ 551–59, 701–06.

46.    The APA allows persons and organizations to challenge final agency actions in the federal courts. *Id*. §§ 702, 704.

47.    The APA declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id*. § 706(2)(A).

48.    An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## V.    FACTUAL ALLEGATIONS

**Clark Fork Face Project**

49.    The Clark Fork Face Project is located approximately 50 miles east of Missoula, Montana, primarily in the Garnet Mountain Range with treatment units on both sides of Interstate-90 in the Clark Fork River sub-basin between Bonner and Drummond.

50.    The Project is within the jurisdiction of the BLM's Missoula Field Office.

51.    The Missoula Field Office RMP was approved in January 2021 and sets forth the land management standards and guidance for managing approximately

163,000 acres of BLM-administered public lands and approximately 267,000 acres of federal mineral estate across all of western Montana.

52.    Over 99 percent of the BLM surface lands managed by the Missoula Field Office are located in Granite, Missoula, and Powell counties.

53.    On March 23 and 25, 2021, the BLM held two public meetings, the first in Clinton and the second in Drummond, about the proposed Clark Fork Face Project.

54.    The BLM posted its Draft EA for the Clark Fork Face Project to its ePlanning website on December 5, 2022.

55.    An initial two-week public comment period was extended to five weeks and concluded on January 15, 2023.

56.    On December 17, 2022, and January 6, 2023, Plaintiffs submitted extensive comments and supporting documents to the BLM regarding the Draft EA.

57.    The BLM published its Final EA, Decision Notice, and Finding of No Significant Impact ("FONSI") on April 18, 2024. The Decision authorized implementation of the Proposed Action (Alternative 2) with no permanent road construction.

58.    The BLM determined that the Project will not significantly impact the quality of the human environment, and therefore, an EIS was not warranted.

59.    Plaintiffs submitted an appeal of the Final EA, Decision, and FONSI on May 15, 2024.

60. The Project planning area totals approximately 247,191 acres and is comprised of a mix of federal, state, and private ownership.



61. BLM ownership makes up 10% of the Project planning area. Formerly owned by the Stimson Lumber Company as a large industrial forest, 48% of the Project planning area is now made up of small, nonindustrial private landowners who are constructing buildings and homes in the forest. Logging and other treatments will occur on BLM managed lands only.

62. The Decision Notice authorizes treatment on 16,689 acres (roughly 70% of BLM-owned lands) including the following:

    a. logging with burning on 8,283 acres;

    b. thinning on 1,394 acres;

    c.  fuels management treatments (described as reducing tree densities and associated slash) on 2,146 acres;

    d.  prescribed fire on 4,629 acres;

    e.  limber pine enhancement (stand level thinning) on 237 acres; and

    f.  temporary road construction of approximately 6 miles of roads.

63.    The Project will remove 4 million board feet of timber from the forest per year, or roughly 40 to 60 million board feet over its 10 to 15-year lifespan.

64.    The Decision authorizes winter logging, burning, and road-related activities.

65.    In preparing the EA, the BLM analyzed three alternatives: a no action alternative, the proposed action alternative, and a proposed action sub-alternative.

66.    Ultimately, the BLM authorized the proposed action alternative but "without permanent road construction." Therefore, the BLM states that the Project will not construct any new, permanent roads "anywhere in the planning area," but 19 miles of unmapped roads "currently existing on the landscape" will be added to the BLM system and used for hauling timber, and approximately 6 miles of temporary spur roads will be constructed.

67.    Although the Decision Notice states that only roads "currently existing on the landscape" will be used for hauling timber, a significant but ultimately unknown number of miles of those roads are presently "impassable." "Impassable" roads are defined in the RMP as roads that have "been treated in such a manner

that the road is blocked" by natural vegetation growth, road entrance obliteration, fallen trees, boulders, or other means.

68.    For example, below are photos of two locations along future haul roads currently "existing" within the BLM system:

 

69.    In the EA, the BLM reasones that because the chosen alternative does not include any permanent road construction, the Decision "eliminate[s] any possible concerns associated with road construction on wildlife populations and habitats, particularly grizzly bear, Canada lynx, and wolverine."

70.    The EA does not include any further discussion or analysis regarding potential road-related impacts, but rather repeats this reasoning throughout the EA to dismiss road-related impacts to other various resources.

71.    The EA lists four Project objectives: (1) reduce forest fuel loading and break up homogenous stand conditions in the WUI; (2) increase the acreage of forest communities moving toward the "midpoint" of the Natural Range of Variability

("NRV"); (3) maintain and enhance limber pine (Pinus *flexilis*) populations where present; and (4) where feasible and appropriate, provide opportunities for timber harvest including the salvage of dead timber while it remains salvageable.

72.    The EA states that according to the Missoula Field Office RMP, which was approved in January 2021, about 70% of the Project planning area is considered WUI (175,830 acres) and 5,064 of those acres occur on BLM lands (24%).

73.    However, the BLM reasons that because "subdivision and rural development have effectively transitioned the entire planning area to [WUI]," the EA departs from the RMP (which is based on the community wildfire protection plans adopted by Missoula, Powell, and Granite counties under the Healthy Forests Restoration Act, 16 U.S.C. §§ 6501–92d) to define the WUI for the Project as all subdivisions and structures in the Project area and the one-mile buffer around them.

74.    Consequently, the Decision authorizes and prioritizes fuels treatments on all areas within what the RMP designated Fire Management Zone ("FMZ") 1 (high-priority areas) and the 1-mile buffer around areas within FMZ 2 (lower-priority areas) that are "functioning as WUI" under the Project's new, much more expansive definition of that term. (*See* EA Appendix D.)

75.    In other words, the Project's "functional WUI" greatly expands the scope of the WUI as analyzed in the EIS for the RMP, and it effectively allows the BLM to log all BLM lands within the planning area—including Canada lynx habitat

occurring within federally designated lynx Critical Habitat that had previously been protected under conservation measures adopted in the RMP.

76.    Forest vegetation in the planning area was divided into broad habitat type groups ("HTGs"), which are defined as groupings of similar habitat types.

77.    Habitat types are "an aggregation of ecological sites of like biophysical environments (such as climate, aspect, elevation and soil characteristics) that produce plant communities of similar composition, structure, and function."

78.    Appendix G compares the Project area's current conditions to the agency's desired conditions for each HTG. In tandem with Appendix G, EA Figures 20 through 25 show that forest conditions are currently within the NRV for most HTGs, although all HTGs fall well below the desired percentage of large and/or very large diameter trees, which makes sense considering these lands have historically been heavily logged.

79.    Regarding the Project's stated goal to move forest communities toward "midpoint NRV," that term is not defined in the EA, and it is unclear how logging, thinning, and burning to remove the vast majority of pole, medium, and large trees currently regenerating from past logging will achieve the agency's desired conditions, which include having a majority of large and very large trees in most habitat groups, any time soon.

80.     Logging and burning, or "timber harvest with prescribed burning," the action authorized for the majority of the treated acres in the Project area, involves using "[v]arious silvicultural systems . . . to meet the proposed action objectives depending on forest conditions existing at the specific treatment units."

81.     In other words, the BLM does not know how many trees it will ultimately cut down or how many it will leave standing in each unit.

82.     Within the areas BLM categorized as HTG-1, HTG-2, and HTG-3 (approximately 6,351 acres) on Douglas-fir dominated sites, logging will generally reduce residual stocking to roughly 60 to 80 square feet of basal area per acre and reduce the mean diameter of at least 50% of the Douglas-fir in the stand to less than 10 inches.



Figure 2: Stand #2054 of the CFF planning area exhibiting a densely stocked, single storied stand condition. This stand is proposed for Timber Harvest with Prescribed Burn treatment and is within HTG-2. BLM photo 2014.



Figure 13: Completed Single Tree Selection in ponderosa pine stand (HTG-1 – HGT-3). BLM Photo.

83.     Within HTGs 4–6 (approximately 1,370 acres) on lodgepole pine dominated sites, treatments would often retain less than 30 square feet of basal area per acre to encourage re-initiation of early seral species via natural regeneration.



Figure 10: Stand 1156 of the CFF planning area exhibiting a single storied stand with noticeable MPB induced mortality. This stand is proposed for Timber Harvest with Prescribed Burn treatment and is within HTG-6. BLM photo 2014.



Figure 14: Completed regeneration harvest, salvage / sanitation in LP-WL stand (HTG-4 – HTG-6). BLM Photo.

84.    "Fuels management treatments" involve reducing tree densities and slash, including by mechanical treatments designed to "remove shade-tolerant ingrowth in the understory and retain shade intolerant species in the overstory." Thus, in addition to logging and burning over 8,000 acres in timber harvest units, fuels management treatments will also involve logging mature trees with the use of large equipment "such as wheeled tractors, crawler-type tractors, skidders, feller bunchers, excavators, bobcats, or specially designed vehicles with attached implements" on more than 2,000 acres.

85.    "Thinning" and "limber pine enhancements" call for manually cutting sapling to pole-sized trees with chainsaws or hand tools to reduce stem densities.

86.    Prescribed burning is defined in the EA as low to moderate intensity broadcast burns resulting in varying degrees of mortality to the seedlings, saplings, and pole-sized conifers, as well as low to moderate severity fire effects in the medium, large, and very large conifers. Maintenance treatments such as follow-up

24

prescribed burning will be implemented as needed following the initial treatment.

87.    Control lines may be used on all or portions of prescribed fire burn units and may include roads, trails, rock scree, or constructed fire lines. Fire lines may be constructed by hand, machines, or by using fire line explosives.

88.    Logging and burning activities by neighboring landowners will also occur within the Project planning area within the next three decades and the BLM expects those activities to disturb and temporarily displace grizzly bears, lynx, and wolverine, as well as big game species such as elk and deer.

89.    The EA states that "[i]n the short-term, such projects could exacerbate the disturbance and displacement effects of this project in the immediate area where the treatments are expected to occur within a given season."

90.    In Appendix H, the EA identifies the legal coordinates of 18 nearby projects by other landowners that are either currently occurring or are expected to occur within the reasonably foreseeable future. These actions total 4,986 acres of additional logging, thinning, and/or burning by governmental and private entities.

91.    The number of miles of new permanent or temporary roads associated with these projects is not disclosed in the EA.

92.    No map of reasonably foreseeable actions is provided to allow the BLM or the public to understand the timeline, scale, or proximity of these activities to Project treatment units or any particular habitat types.

93.    This is problematic because, for example, "Top Secret," a state-authorized logging project listed in Appendix H, includes logging 340 acres in the Bear Creek Lynx Analysis Unit directly adjacent to Project treatment units encompassing current lynx habitat.

94.    There is no analysis in the EA about how nearby projects, like "Top Secret," may affect wildlife, connectivity, or security. Rather, potential impacts to wildlife (which are discussed in more detail later in this Complaint), are dismissed as insignificant because the BLM falsely assumes that wildlife can easily move away from Project-related disturbances into other suitable habitat without ever disclosing where this other suitable habitat may be.

95.    Even more alarming is that the Coyote Greenough Projects are entirely omitted from Appendix H. These projects are a series of Montana Department of Natural Resources and Conservation-approved logging projects on state trust lands that are currently ongoing within the planning area in very close proximity to Project treatment units.

96.    Over approximately the next eight years (summer 2023 to winter 2031), the Coyote Greenough Projects will remove an estimated 5.5 million board feet of timber from commercial logging on 1,778 acres and pre-commercial thinning on 700 acres. The projects will construct 8.1 miles of new permanent roads and involve maintenance/reconstruction work on 17.41 miles of old or reclaimed roads.

97.    According to the Coyote Greenough Projects EA, the BLM was consulted during scoping.

98.    In addition to potential impacts from other reasonably foreseeable logging projects, a variety of recreational activities currently occur year-round in the Project area, including snowmobiling, hunting, mountain biking, cross country skiing, rock climbing, and hiking.

99.    Recreationalists in "utility task vehicles" (side-by-sides) and "all-terrain vehicles" (four-wheelers, etc.) also regularly use the Project area.

100.    Approximately 91 miles of snowmobile trail occur within the Garnet National Winter Recreation Trail Special Management Recreation Area. Of these 91 miles, 48 miles are groomed in partnership with a local snowmobile club.

101.    The EA acknowledges that snowmobiles and skiers can currently travel on _and off_ roads across the planning area, but the BLM nevertheless concludes that recreational use is not expected to increase or result in barriers to wildlife dispersal because the Project does not build any new roads or re-designate any existing roads as open to motorized use.

**Wildlife in the Project Area**

102.    The EA states that the Project is in conformance with the 2021 Missoula Field Office RMP and that it implements the goals, objectives, and management actions of the RMP, as required by FLPMA.

103.   According to the RMP, all BLM-authorized activities in the Missoula Field Office must meet or move toward providing habitat that maintains a viable and diverse population of native plant and animal species, including special status species like threatened grizzly bears, lynx, and wolverine.

104.   For example, under Wildlife Goal 1 ("WL-G-1"), the BLM will strive to "[m]anage habitat to conserve and recover species listed under the [ESA]."

105.   Relatedly, Wildlife Objective 2 ("WL-OBJ-2") seeks to "[r]educe, minimize, or avoid fragmentation of large intact security habitat, important to special status species and other wildlife" in order to "[m]aintain functional blocks of security habitat for special status species and other wildlife across the landscape."

106.   Wildlife Management Action 2 ("WL-MA-2") contains the substantive requirement that the BLM "[i]dentify timing and spatial restrictions at the project level for activities that might impact special status species and their habitats" as well as "[a]void, minimize, or mitigate human activities disrupting special status species habitats during their season of use, particularly during the breeding, and winter seasons" and "[m]inimize disturbance during crucial times for elk and big game (winter range, calving)."

107.   However, the Project authorizes winter logging and nowhere in the EA does the BLM identify specific timing or spatial restrictions for activities, only generally states that time and space will mitigate any impacts to wildlife and habitats.

108.  For example, the EA states that disruptions to elk winter range "will be tempered by spatial and temporal factors (19,147 acres treated over 5-15 years, or sub alternative 2(b) 14,662 acres) limiting the disturbance footprint in any given season."

109.  Regarding impacts to grizzly bears, the EA states that "[o]nly a small portion of the planning area would be affected in any season because implementation would occur over a 5-15-year period."

110.  As to lynx, the EA states that "disturbance, temporary displacement, increased energy expenditure and reduced reproductive success may occur due to increased human presence and heavy equipment use during treatment implementation, but these effects would be minimized by spatial and temporal factors of the project design."

111.  The lynx discussion reiterates that "project implementation would occur within distinct treatment blocks over a 5–15-year period" and "only a portion of the acres of treatments in the Lynx Analysis Area would take place in any one season, i.e., treatments in any season would only affect a portion of any lynx's home range."

112.  Because timing and spatial restrictions are not specifically identified at the project level, such vague discussion falls short of what is required by the RMP.

113.  Similarly, WL-MA-8 requires the BLM to "[p]rovide habitat of sufficient

quantity and quality, including connectivity and wildlife movement corridors, habitat complexity, forest openings, edges, and ecotones, to enhance biological diversity and provide quality, sustainable habitat for native wildlife species."

114.    Yet, nowhere in the EA are connectivity or wildlife movement corridors specifically described or mapped.

115.    The EA merely suggests that areas outside of current treatment blocks or on other lands will provide safe passage for wildlife.

116.    Such deficiencies are particularly problematic when considered alongside the following other omissions and shortcomings in the EA's wildlife analyses:

### *Grizzly Bears*

117.    Grizzly bears are a federally protected species under the ESA.

118.    Although no critical habitat has been designated for grizzly bears, the Clark Fork Face Project is located just south of the Northern Continental Divide Ecosystem ("NCDE") Recovery Zone, which is considered the "Primary Conservation Area" for NCDE grizzly bears under the U.S. Fish and Wildlife Service's ("USFWS") 1993 Grizzly Bear Recovery Plan ("Recovery Plan").

119.    The EA states that the Project will adhere to the 2013 Northern Continental Divide Ecosystem Grizzly Bear Conservation Strategy ("Conservation Strategy") and the Recovery Plan.

120.    The Conservation Strategy incorporates a zoned system to monitor and

support grizzly bear range expansion and recovery across the wider region. Clark Fork Face Project activities will occur on lands within NCDE zones 1 and 2.

121.   Under the Conservation Strategy, NCDE Zone 1, which is roughly the immediate 10-mile buffer area around the Recovery Zone, is managed to support the continued occupancy of grizzly bears. NCDE Zone 2 is managed to provide the opportunity for grizzly bears to move between the NCDE and adjacent ecosystems.

122.   Males, females, and females with cubs have been documented in the Clark Fork Face Project planning area. Five grizzly bear dens have been documented in the Garnet Range in the last 20 years. Recently in the Nevada Valley, approximately 12 miles north of the planning area, as many as 40 grizzly bears have been observed feeding in agricultural fields during the summer.

123.   As habitat generalists, grizzly bears in the Project planning area primarily feed on grasses, forbs, berries, and ungulates, as well as serviceberry, chokecherry, and hawthorn in the riparian areas along the Clark Fork River.

124.   Although grizzly bear populations within the lower 48 states are largely concentrated around four ecosystems (the NCDE, Greater Yellowstone, Cabinet-Yaak, and Selkirk), grizzly bears are expanding their range and this natural dispersal has allowed the distance between subpopulation to shrink.

125.   It is well-understood that the lack of connectivity and genetic exchange between grizzly bear subpopulations is a threat to long-term grizzly bear recovery.

*Crow Indian Tribe v. United States*, 965 F.3d 662, 678 (9th Cir. 2020); *WildEarth Guardians v. Bucknall*, No. CV 23-10-M-DLC (D. Mont. Nov. 8, 2024).

126.   There have been multiple verified grizzly bear sightings outside of existing ecosystems, including in established linkage zones near the Bitterroot Ecosystem, which does not currently support a known grizzly bear population.

127.   The Conservation Strategy envisions that the NCDE grizzly bear population will serve as a "source population" for other regional grizzly bear populations.

128.   The EA acknowledges that the Project area is a critical "stepping stone" for grizzlies traveling between the NCDE and Greater Yellowstone and Bitterroot ecosystems.

129.   Dispersing grizzly bears are known to utilize the Clark Fork Face Project planning area. The EA notes that at least one adult male grizzly bear was documented using areas both north and south of I-90 in and near the planning area and denning south of the interstate in recent years.

130.   The Recovery Plan states, "Timber management programs may negatively affect grizzly bears by (1) removing thermal, resting, and security cover; (2) displacement from habitat during the logging period; and (3) increases in human/grizzly bear confrontation potential or disturbance factors as a result of road building and management. New roads into formerly unroaded areas may cause bears to abandon the area."

131.    Roads likely pose the most imminent threat to grizzly bear habitat today, and the management of roads is one of the most powerful tools available to balance the needs of people with the needs of grizzly bears.

132.    Roads pose a significant direct threat to grizzly bears because roads provide humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental and defense-of-life shootings and intentional poaching.

133.    Human access leads to indirect bear mortality by creating circumstances in which grizzly bears become habituated to human food and are later killed by wildlife managers.

134.    Roads and human access can also result in indirect mortality by displacing grizzlies from good habitat into areas that provide sub-optimal habitat conditions.

135.    Displacement has long-term effects. Female grizzly bears who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can persist for several generations before grizzly bears will return to habitat in close proximity to closed roads.

136.    This phenomenon helps explain why grizzly bears are known to avoid roaded areas even when the roads are officially closed to public use.

137.    Displacement also negatively impacts the survival rates of grizzly cubs. Studies have shown that female grizzly bears selected for, and survived better in, areas with more secure habitat.

138.   The Recovery Plan states that "[s]urvivorship of the offspring of females that lived in unroaded, high elevation habitat was lower than that recorded in other study areas in the [NCDE]. The majority of this mortality was due to natural factors related to the dangers of living in steep, rocky habitats. This is important in that the effects of road avoidance may result not only in higher mortality along roads and in avoidance of and lack of use of the resources along roads, but in the survival of the young when their mothers are forced to live in less favorable areas away from roads."

139.   Further, "[s]ince adult females are the most important segment of the population, this lack of use of both open-roaded and closed-roaded areas is significant to the population."

140.   The Interagency Grizzly Bear Committee ("IGBC") has found that secure habitat (or "core areas"), which are areas free of motorized access, are an important component of grizzly bear survival and recovery. The IGBC states that secure habitat must be in place and undisturbed for at least 10 years, which is based on the generation time for a female grizzly bear to replace herself in the population.

141.   The EA acknowledges that road density and secure habitat availability are primary indicators of habitat suitability for the NCDE grizzly population because some bears avoid roads and roads may displace bears from otherwise suitable foraging and cover habitats and increase the potential for human/bear conflicts.

142.    Under the Conservation Strategy and the Missoula RMP, in NCDE Zone 1, there may be no net increase in the linear miles or density of roads that are open for public motorized use during the non-denning season on BLM lands.

143.    The baseline for open road density on BLM lands in NCDE Zone 1 is 1.70 mi/mi$^2$ and defined as "conditions on existing BLM-administered public lands as of [December 31, 2011], as modified by changes in numbers that were evaluated and found to be acceptable through the Endangered Species Act Section 7 consultation with the USFWS while the grizzly bear was listed as threatened."

144.    Open road density across the entire Project planning area is high (2.46 mi/mi$^2$), with an open road density of 3.49 mi/mi$^2$ on BLM-managed lands.

145.    The EA does not calculate or state the baseline total linear or road density calculation for the Project area within in NCDE Zone 1.

146.    As briefly discussed earlier in this Complaint, the RMP and the Conservation Strategy similarly define "impassable road" as a road that has been treated in such a manner that the road is blocked and there is little resource risk if road maintenance is not performed on a regular basis (i.e., it is self-maintaining).

147.    As previously discussed, an unknown number of currently impassable roads have been approved as haul routes for the Project. A number of these roads are currently heavily vegetated and/or blocked with rocks and/or berms.

148.    Under the Conservation Strategy, "[i]mpassable roads may remain on the

35

inventoried road system if use of the road is anticipated at some point in the future. The caveat is: if an impassable road is bladed open . . . , the road will be included in analyses based upon the type of closure device. If the new closure device is a physical barrier (berm, rock, etc.), the road will be included in the . . . [total road] calculations."

149.   The EA does not discuss or specify which current system routes will be bladed open. Rather, the BLM's conclusion that the decision not to build any new permanent roads for the Project "eliminate[s]" all road-related effects to wildlife falsely assumes that all current system roads are passable.

150.   The EA states that "[s]hort term increased traffic and large vehicle traffic is expected on roads open to the public during implementation."

151.   The EA does not acknowledge that traffic will also increase on administrative roads and haul routes not open to the public, at least during Project implementation, or that even closed roads can have long-term impacts on wildlife.

152.   The EA does not discuss or specify which system roads are currently open to the public, nor does it discuss or specify which currently impassable roads will remain open to the public after they have been cleared of vegetation and bladed for Project use.

153.   Approximately 6.24 miles of temporary roads will be constructed and used during the Clark Fork Face Project with 2.15 miles to be constructed in NCDE

Zone 1 and 4.09 miles in NCDE Zone 2. The EA specifies that temporary roads

will remain operational for no longer than three years.

154.   The EA states that, of the temporary roads to be constructed and used during

the Clark Fork Face Project, approximately 0.33 miles are in areas expected to

affect approximately 266 acres of secure habitat.

155.   The EA does not locate or map these areas of secure habitat, preventing the

public from understanding how specific haul routes (including currently "existing"

but impassable roads) may affect security for grizzly bears and other wildlife.

156.   Likewise, the BLM failed to consider impacts to grizzly bears from

increased access into secure areas both via old roads that will be re-opened and via

the wide-open forest stands that will result from logging and burning.

157.   The best available science suggests that snowmobiling may disturb grizzly

bears while they are in their dens and after emergence from their dens in the

spring. The Conservation Strategy states that "[b]ecause grizzly bears are easily

awakened in the den (Schwartz et al. 2003b) and have been documented

abandoning den sites after seismic disturbance (Reynolds et al. 1986), the potential

impact from snowmobiling should be considered."

158.   In response to public comments concerned with an increase in recreational

vehicle use, the BLM concluded that "[a]dding new roads should not attract more

or new snowmobile use as these roads aren't part of the snowmobile trail system

and snowmobiles can already access and use the project area in most places."

159.  Elsewhere, the EA concludes that "[p]er current management direction, snowmobiles are already allowed to use much of the project area on or off roads," but anticipates "[n]o change in snowmobile access from Project activities" because "no new motorized routes are proposed, no new snowmobile routes or open areas are proposed, and the effect of proposed spur roads on recreational activity is minimal due to their short length and location at the ends of or spurring off currently existing roads."

160.  However, this brief discussion entirely fails to take into account that many "existing" roads are currently impassable, and logging and burning will open up forest stands across an area that is already heavily utilized year-round by recreationalists who are in no way limited to prescribed routes or existing roads.

161.  As the Conservation Strategy directs, any potential increase in access or use by snowmobilers and other recreationalists, like hunters or skiers, that may amplify the risk of disturbance to grizzly bears and other wildlife must be considered.

### *Canada Lynx and Lynx Critical Habitat*

162.  In 2000, the USFWS listed Canada lynx ("lynx") in the lower 48 states as a threatened species under the ESA and later designated Critical Habitat for lynx.

163.  The Lynx Assessment was developed to "provide a consistent and effective approach to conserve Canada lynx on federal lands. The Lynx Assessment applies

to all lands "mapped as lynx habitat" and recommends measures "intended to conserve the lynx, and to reduce or eliminate adverse effects from the spectrum of management activities on federal lands."

164.    These conservation measures "focus[] on areas where habitat could support resident populations and contribute to the long-term conservation of lynx."

165.    The Lynx Assessment recommends the use of the "lynx analysis unit" ("LAU") as the appropriate scale for investigating the effects of a project on lynx.

166.    The Lynx Assessment conservation measures instruct agencies to:

> [M]aintain the amount and distribution of lynx foraging habitat over time, manage so that no more than 30% of the lynx habitat in an LAU is in an early stand initiation structural stage or has been silviculturally treated to remove horizontal cover (i.e., does not provide winter snowshoe hare habitat). Emphasize sustaining snowshoe hare habitat in an LAU. If more than 30% of the lynx habitat in an LAU is in early stand initiation structural stage or has been silviculturally treated to remove horizontal cover (e.g., clearcuts, seed tree harvest, precommercial thinning, or understory removal), no further increase as a result of vegetation management projects should occur on federal land.

167.    Finally, the Lynx Assessment states,

> Recognizing that natural disturbances and forest management of private lands also will occur, management induced change of lynx habitat on federal lands that creates the early stand initiation structural stage or silviculturally treated to remove horizontal cover should not exceed 15% of lynx habitat on federal lands within a LAU over a 10-year period.

168.    In 2020, the BLM revised their RMP for the Missoula Field Office.

169.    The RMP EIS states that the Chamberlain area (northern Garnets) has "substantial percentages" of lynx habitat.

170.   It further acknowledges that the "levels of lynx multi-storied habitat on BLM only lands are higher than lands within the forest vegetation analysis area [suggesting that BLM lands] are providing more habitat on a per acre basis than adjacent other federal and state lands within the forest vegetation analysis area."

171.   Apart from disclosing that the RMP planning area has "roughly 63,000 acres providing potential lynx habitat," the BLM did not disclose or explain how it defined "lynx habitat," or disclose where those 63,000 acres of lynx habitat exist within the planning area.

172.   The RMP states as an objective,

> Contribute to the conservation and recovery of listed terrestrial wildlife species and their habitats through the current and future USFWS recovery plans or interagency strategies such as the Canada Lynx Conservation Assessment and Strategy, Canada lynx critical habitat designation, and the final NCDE Grizzly Bear Conservation Strategy in coordination with the USFWS through Section 7 consultation.

173.   The RMP then states, "Fuels treatment projects within the within the 1-mile wildland urban interface (WUI) buffer (approximately 7,648 acres) and Fire Management Zone 1 not meeting lynx conservation measures (due to protecting life, increasing the safety of firefighters, and protecting property, improvements, and infrastructure) may occur."

174.   However, the Lynx Assessment does not exempt from its conservation measures lynx habitat within the WUI or FMZ 1.

175.   At the Project level, the Clark Fork Face Project EA states that the Project will adhere to the Lynx Assessment and the USFWS's Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment, 79 Fed. Reg. 54782 (Sept. 12, 2014).

176.   Lynx may be present in the Project planning area. In fact, as recently as the early 2010s, the Garnet Range supported a resident lynx population. From 1999–2006, reproduction was documented at 57 dens of 19 female lynx in Seeley Lake, the Garnet Range, and the Purcell Mountains in western Montana.

177.   The BLM acknowledges these areas may still be used by dispersing lynx.

178.   Lynx are medium-sized cats with large, furry feet adapted to walking on deep, fluffy snow, long legs, tufts on the ears, and black-tipped tails.

179.   Lynx home ranges generally center around continuous forests with persistent snow. Lynx frequently use ridges, saddles, and riparian areas, but avoid large openings in forest cover, either natural or man-made, when moving through their home ranges.

180.   The Lynx Assessment characterizes lynx habitat as boreal forest with gentle rolling topography, dense horizontal cover, deep snow, and moderate to high snowshoe hare densities. In Northwest Montana, lynx generally occur in moist subalpine mixed-conifer forests dominated by Engelmann spruce, subalpine fir, Douglas-fir, western larch, and lodgepole pine.

41

181.   In general, mature multi-story forests with dense horizontal cover, large diameter trees, and lower live limbs at the snow surface provide good lynx foraging habitat during winter. However, in the summer, lynx will also use younger regenerating stands with abundant small diameter and pole sized trees, abundant total shrubs, and high horizontal cover.

182.   Lynx denning habitat is structurally complex, typically located near foraging habitat and containing a high volume of large down logs in mature conifer forests.

183.   Throughout their range, lynx primarily prey on snowshoe hares. Lynx density, home range size, dispersal patterns, reproductive parameters, and survival rates are strongly correlated to snowshoe hare abundance.

184.   The amount and density of horizontal cover strongly influences snowshoe hare abundance because dense horizontal cover reduces exposure to predators and provides better access to forage and thermal protection during the winter.

185.   Snowshoe hare densities are higher in areas where dense, horizontal patches are more contiguous or where similar patches are surrounded by other patches of similar structure.

186.   Project treatments north of I-90 will occur entirely within designated lynx Critical Habitat. This means that the USFWS has determined that the area contains the physical and biological features essential to the conservation of the species in the appropriate quantity and spatial arrangement to support interbreeding lynx

populations over time. In designating federal lands in the Garnet Range as Critical Habitat, the USFWS reasoned that the area plays an important role connecting lynx populations in Canada to other populations across the Rocky Mountains.

187.   Despite meeting the criteria for Critical Habitat designation, under ESA § 4(b)(2), the USFWS exempted all tribal and state trust lands in western Montana from the designation, thus exempting those lands from the ESA's prohibition against destruction or adverse modification of lynx habitat, so long as the state lands are being managed in accordance with a 2010 state habitat conservation plan that incorporates some protections for lynx and lynx habitat.

188.   The Clark Fork Face Project lies within the Bear Creek, Elk Creek, Union Creek, and McElwain Complex LAUs, which total 190,066 acres. The EA states that 34.5% of the planning area (a total of 85,188 acres) falls within an LAU, and approximately 19,790 LAU acres are on BLM land.

189.   More than 20% of the lands in the Project planning area are state trust lands; therefore, federal Critical Habitat protections do not apply to those lands.

190.   Nor do protections apply to private lands within the Project planning area.

191.   Lynx have been known to travel "dispersal" distances of up to 620 miles to find a new home range. Periodic declines in snowshoe hare populations in Canada have caused influxes of dispersing lynx into the northern United States, supporting the hypothesis that immigrating lynx have been able to successfully colonize

southern areas and highlighting the need for management actions to maintain

connectivity with the core of the lynx's geographic range in Canada.

192.  Squires et al. (2013) found that connectivity between lynx habitat in Canada

and the conterminous United States is facilitated by only a few putative corridors

that extend south from the international border. The primary corridor parallels

Montana Highway 83 and branches out in several directions when it intersects with

Highway 200, the northern boundary of the Project planning area.

193.  The dark gray areas within the planning area are "capable of supporting

Canada lynx:



**Fig. 4.** Putative corridors facilitating dispersal from northern populations to patches capable of supporting Canada lynx (shaded areas) in the Northern Rocky Mountains based on least-cost path analysis of movement surfaces empirically defined using population-level, step-selection models, 2005–2007.

194.  The study concluded that "[m]aintaining the integrity of these connectivity

corridors is of primary importance to lynx conservation in the Northern Rockies."

195.  The EA states that lynx habitat occurs in mesic coniferous forests that

44

experience cold, snowy winters and provide a prey base of snowshoe hare, which require hiding and thermal cover and forage provided by multi-story forests with dense horizontal cover.

196.   The EA states that although "typical" lynx habitat contains subalpine fir and Engelmann spruce mixed with lodgepole pine, moist Douglas-fir cover types may provide potential lynx foraging habitat in the advanced regeneration stage.

197.   Consistently, the Lynx Assessment confirms that "[b]ecause lynx are highly mobile, it is recognized that other vegetation types when intermixed with the primary vegetation may also be used by lynx."

198.   Of the 19,790 LAU acres on BLM land in the planning area, 16,284 acres were proposed for treatment in the EA. Treatments were proposed to occur in all nine HTGs.

199.   In the EA, the BLM states that, per conservation measures, prescribed burning will not occur within "Canada lynx habitat" and irregular thinning techniques would be used to retain shade-tolerant seedlings and shrubs less than three feet tall for understory snowshoe hare cover "where possible."

200.   Yet, despite the entire Project occurring in designated lynx Critical Habitat, the BLM determined that only 221 to 248 acres[1] proposed for treatment in

---

[1] This ambiguity is because the Decision Notice authorizes an alternative that was not fully analyzed in the EA, the "Proposed Action with No Permanent Roads."

potential lynx habitat are in fact "current lynx habitat" as defined by the BA for the Project, which limits lynx habitat to HTG-4, HTG-5, and HTG-6 cover types dominated by subalpine fir and Engelmann spruce in mature forest, stand initiation, or stand regeneration phases.

201.   In other words, even though the Project is entirely within lynx Critical Habitat—and the BLM's admission in the RMP EIS that BLM lands contain "substantial percentages" of lynx habitat and that BLM lands "are providing more habitat on a per acre basis than adjacent other federal and state lands" within the Project area—the BLM deemed more than 16,000 acres "currently" unsuitable for lynx, allowing those acres to be logged without any lynx conservation measures.

202.   And, because all 248-or-so acres falling within the BLM's narrow definition of "current lynx habitat" are located within either the "functional WUI" or FMZ 1, even those acres will be treated, but with irregular thinning techniques "where possible," and those areas would not be burned. This is allowed despite the BLM's acknowledgement that these areas may still be used by dispersing lynx.

203.   This is important because the best available science has established that timber harvest, climate change, fire suppression or fuels treatment, habitat fragmentation associated with road-building (and associated increases in traffic volumes and/or speeds), and commercial, recreational, and energy/mineral development pose habitat-related threats to lynx in the Northern Rockies.

46

204.   Similarly, logging negatively impacts lynx dispersal, productivity, and foraging habitat because lynx are known to avoid open forest and areas that have recently been logged or burned. Thinning reduces dense horizontal cover and has been shown to reduce snowshoe hare numbers by as much as 2- and 3-fold for up to 11 years post-thinning. Fuels management projects reduce ladder fuels in mature multi-story forests, reduce horizontal cover, and degrade winter lynx habitat.

205.   The best available science is clear that fragmentation of the naturally patchy pattern of lynx habitat in the contiguous United States affects lynx by reducing their prey base and increasing the energetic costs of using small, spread-out patches of suitable habitat within their home ranges.

206.   Additionally, landscape-scale fragmentation directly affects lynx by creating openings that increase access by competing carnivores, especially in the winter when lynx have traditionally been able to exploit their evolutionary edge over other predators such as coyotes and mountain lions.

207.   This all has particularly problematic consequences in places like the Clark Fork Face Project area, which has been heavily impacted by logging and mining activities historically, and is now experiencing high levels of additional human impacts on private lands while still serving as a keystone corridor for connectivity.

208.   The EA admits that lynx "disturbance, temporary displacement, increased energy expenditure and reduced reproductive success may occur due to increased

human presence and heavy equipment use during treatment implementation," but reasons that "these effects would be minimized by spatial and temporal factors of the project design, i.e. project implementation would occur within distinct treatment blocks over a 5–15-year period. . . . [and] treatments would only affect a portion of any lynx's home range."

209.   The EA concludes that "[l]ynx are also expected to move away from the disturbance or to more [sic] to secure areas on adjacent public lands (43.9% of the planning area)," despite acknowledging that "[l]ynx that move to surrounding private lands (56.1% of the planning area) may encounter human activities that could cause them to move farther away from the larger disturbance."

210.   Importantly, the EA does not specify when or where activities within the "distinct treatment blocks" affecting lynx habitat will occur, nor does it suggest into which "adjacent public lands" displaced lynx are expected to move.

211.   The EA opines that proposed treatments may temporarily degrade lynx habitat by "altering or delaying the development of horizontal cover or removing coarse woody material," but "the treatments are not expected to affect the stands' potential to produce these [features] in the future."

212.   The EA further notes that "[a]s treatment units reach advanced regeneration, snowshoe hare population densities could increase in HTG 4-6."

213.   In other words, the BLM writes off any long-term effects to threatened

48

wildlife species like the lynx because although Project activities will destroy habitat, trees and shrubs will grow back, eventually.

### *North American Wolverine*

214.   In November 2023, the North American Wolverine was listed as a threatened species under the ESA. 88 Fed. Reg. 83,726 (Nov. 30, 2023).

215.   The USFWS found the wolverine's "specialized habitat associations, low genetic diversity and population size, narrow ecological niche, low tolerance for human disturbance, and slow reproductive rate all contribute to the wolverine's relative difficulty in adapting in-place to future environmental change."

216.   Wolverine have large home range sizes, high intrasexual territoriality, and an ability to disperse long distances, sometimes up to hundreds of miles.

217.   The best available science indicates that human disturbance (road density) and food availability are major drivers of wolverine distribution in winter.

218.   As evidence of this, the listing decision discussed that recent studies have established forest roads used by snowmobilers in the Canadian Rockies have a strong negative correlation with wolverine distribution.

219.   Additionally, wolverine detection has been strongly and negatively correlated with both summer and winter non-motorized recreation.

220.   Recent studies have also shown that connectivity among wolverine habitat is particularly sensitive to housing developments and other human impacts in rugged

areas located between typical wolverine habitats.

221.   As with lynx, human development may result in cascading impacts by increasing competition from other mesocarnivores that are less affected by human disturbance.

222.   Wolverine have been documented within and immediately surrounding the Project planning area, increasingly within the last decade. Between 1932 and 2023, 833 wolverine were documented within a 50-mile radius of the center of the Project planning area with 2016 recording the highest number at 126.

223.   The EA notes that the Project area facilitates dispersal for male and female wolverine into surrounding primary habitats found at higher elevations like the nearby roadless Wales Creek Wilderness Study Area, which includes rugged features and receives persistent spring snow, providing important secure habitat that is relatively difficult to access, especially during the winter.

224.   The EA acknowledges that "[a]lthough it is difficult to track dispersing wolverines, especially those making long-distance dispersals outside their natal home ranges, dispersal habitat within BLM treatment areas in its contribution to the entire action area is expected to play an important role in connectivity and long-term persistence of wolverine."

225.   Despite the area's undisputed importance, the EA concludes that the Project "will have an insignificant effect on connectivity."

226.   To support this conclusion, the BLM reasons that "[o]vertime [sic], the proposed action is expected to restore healthy ecological conditions." At the same time, the EA admits that in both "male and female dispersal habitat, treatments . . . are expected to affect the development of forest structure during the following decades with the expected desired conditions taking decades in some cases."

227.   Additionally, the EA notes that "the effects from new road building, use and subsequent reclamation are likely to result in some level of disturbance and subsequent avoidance behavior that is likely to disrupt general movements, feeding activity and or dispersal through the action area when coupled with vegetation treatment, if individuals are present."

228.   However, the EA concludes that "these effects are expected to be insignificant because roads are such a minor component to an already small treatment footprint (11% of the action area), especially when almost 5 miles will be reclaimed."

229.   The EA further opines, "If dispersing through, wolverine are expected to adjust their movements away from the road disturbance."

230.   Although the BLM anticipates overall levels of recreation will increase in the coming years, the EA finds the Project "is not expected to change levels of recreational use or create further barriers to [wolverine] dispersal."

231.   As previously discussed regarding the impacts of Project activities to other

wildlife, this reasoning entirely fails to consider the implications of opening up currently impassable roads and wide swaths of the forest understory to both motorized and non-motorized year-round Project-related and recreational use.

### Elk and Elk Security

232.    Finally, the BLM fails to demonstrate the Project's compliance with the RMP's requirements for big game.

233.    Adequate travel corridors, security habitat and forage availability are important to maintaining elk populations, particularly in winter range.

234.    The Project will "disturb" roughly 3,500 acres of elk winter range over a five to 10-year implementation period.

235.    WL-MA-12 requires hiding and thermal cover habitat components near quality elk summer and fall habitat (such as wallows, mineral licks, corridors, etc.) across cool/moist habitat type groups.

236.    WL-MA-13 requires areas with dense early to mid-successional conditions on aspects that provide elk thermal and hiding cover near quality elk forage in winter range across warm/dry habitat type groups.

237.    But the EA does not discuss whether the project will maintain hiding and thermal cover habitat components near quality elk summer and fall habitat or provide thermal and hiding cover near quality elk forage in winter range.

238.    The EA does not even disclose which Project activities are within cool/moist

or warm/dry HTGs. Nor does it disclose where quality elk summer or fall habitats, or winter range are located within the Project area.

239.  Thus, the EA does not demonstrate compliance with these standards because it does not discuss in any detail whether treatments will meet required conditions.

240.  Also, WL-MA-16 requires the BLM to retain large blocks of big game security habitat.

241.  However, the EA does not indicate that the Project will retain any large blocks of big game security habitat. Rather, the EA concludes in general terms that effects to elk, like disturbance and displacement due to increased levels of human activity, heavy equipment use, and road construction during implementation, "will be tempered by spatial and temporal factors," and states without support that there is "ample cover, forage and calving habitat in adjacent untreated areas for elk to utilize during and after treatment implementation to offset the temporary reduction."

242.  As previously discussed, the BLM's repeated reliance on the unsupported assumption that "adjacent untreated areas" will be available to wildlife is insufficient under NEPA and is counter to the facts and evidence in the EA.

**Mature Trees**

243.  The BLM declined to analyze an alternative that eliminated harvest in all mature (late-successional) forest structures because it determined this alternative

would not meet the purpose and need for the Project or the RMP.

244.  Although the Missoula RMP does not identify or define old growth, it does include management direction regarding mature forests, including Forest Vegetation Management Action 8 ("FV-MA-8"), which directs the BLM to "strive to maintain or create the quantity of mature (late-successional) forest structure that is consistent with NRV for a given habitat type group to maintain or enhance habitat for species dependent upon mature forest structures."

245.  Thus, the RMP aims to manage forests to include a large percentage of large or extra-large trees in most HTGs.

246.  The RMP also indicates that the forest is currently within NRV but lacking in large to extra-large trees in most HTGs.

247.  Specifically in regard to lynx habitat, the RMP states that "Canada lynx mature multistory habitat is [currently] at the low to mid-level range of NRV."

248.  Although the EA does not provide any accounting of the mature and/or old-growth forests within in the Project area, the EA indicates that the Project will log an undisclosed amount of mature forests with the aim of returning older stands to earlier forest stages, generally toward the "midpoint" of NRV.

249.  Further, despite ample discussion and evidence elsewhere in the EA indicating that planned timber harvest will remove the vast majority of shrub cover, even in lynx habitat and secure core areas, the EA confusingly states that

"[t]imber management will leave shrub cover and some mature trees, while converting stands to the stand initiation phase."

250.   Converting mature stands that are currently comfortably within the NRV to the stand initiation phase is not consistent with the Project's purpose and need.

251.   Moreover, moving forests, particularly in grizzly bear, lynx, and wolverine habitat, toward the "midpoint of NRV" is not consistent with the RMP's stated goal to "maintain" mature forests structures for wildlife.

**Climate Impacts**

252.   The EA includes a brief discussion on the impacts of the Project on climate.

253.   Although the BLM admits that "an initial forest carbon loss is expected immediately following treatment (1-10 years)," the EA concludes "a longer term (20 – 50 years) forest carbon gain is expected as tree vigor and forest health improve over pre-treatment condition."

254.   Reasoning that because the Project "reduces the potential carbon emissions from to [sic] large-scale mega-fires" and "forest products such as building materials continue to store carbon while the forest carbon stores increase through vigorous growth" after logging, the brief climate analysis in the EA finds that the Project "would be expected to result in a net carbon storage increase" and "have a beneficial impact on greenhouse gas emissions by producing wood for building materials and by using wood as fuel instead of fossil fuels."

255.   This discussion does not meaningfully consider or in any way attempt to quantify the immediate loss of carbon storage and sequestration caused by cutting down thousands of acres of mature trees.

256.   Nor does the EA discuss or attempt to quantify in its brief analysis the immediate impacts of logging-related greenhouse gas emissions from operating large machinery, reconstructing roads, or hauling cut timber on trucks, trains, and ocean liners powered by fossil-fuels.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*The Clark Fork Face Project violates NEPA and the APA*
*because the BLM failed to take a "hard look" at the*
*Project's impacts on the environment, particularly to wildlife,*
*and the EA fails to disclose sufficient information to the public.*

257.   All previous paragraphs are incorporated by reference.

258.   NEPA requires that agencies take a "hard look" at the environmental consequences of its proposed actions before the agency chooses a particular course of action, without favoring a pre-determined outcome. *Lands Council v. Powell*, 395 F.3d 1019, 1026–27 (9th Cir. 2005).

259.   Pursuant to NEPA, the BLM must discuss the effects of a project, including the reasonably foreseeable environmental trends and planned actions in the area, and the significance of those effects. 42 U.S.C. § 4332 (C).

260.   Reasonably foreseeable future actions include federal and non-federal

activities not yet undertaken, but sufficiently likely to occur, such that a person

ordinary prudence would take it into account in reaching a decision. *Id*.; 85 Fed.

Reg. 43,304, 43,331 (July 16, 2020).

261.  NEPA further requires that relevant information be made available to the

public early in the process, before decisions are made, and before actions are taken

so that the public can play a role in both the decisionmaking and implementation of

agency decisions. 42 U.S.C. § 4321.

262.  Agencies must ensure the professional and scientific integrity of the

discussions and analyses in environmental documents, and they must "identify any

methodologies used and shall make explicit reference to the scientific and other

sources relied upon for conclusions in the statement." *Id*. § 4332(D).

263.  The Ninth Circuit has held that when an agency "concludes that a project

will not jeopardize a wildlife corridor, it must support that conclusion with at least

some study or analysis of how the reduced corridor will affect the species at issue."

*Oregon Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007).

264.  The BLM failed to substantiate its conclusions here, in violation of NEPA.

265.  The BLM failed to take a hard look at the Project's impacts to the

environment because the EA does not adequately address the Project's impacts to

wildlife by failing to consider a number of relevant factors.

266.  The BLM failed to adequately disclose or consider the impacts to the

environment of Project activities in combination with current and reasonably foreseeable future actions occurring in the Project area.

267.   The BLM failed to take a hard look at the impacts to grizzly bears, lynx, wolverine, and elk from logging, burning, and other treatments aimed at opening forest stands on over 70% of BLM-owned lands in the Project area.

268.   Despite acknowledging that the Project area currently serves as a linkage zone for grizzly bears, lynx, and wolverine, the EA fails to adequately consider how the Project will impact grizzly bear, lynx, and wolverine connectivity, and fails to support its conclusions regarding connectivity.

269.   The BLM did not consider or disclose the status of the 19 miles of roads "currently existing on the landscape" that the Project will turn into haul roads, nor does the EA acknowledge the reality on the ground, which is that an undisclosed number of Project haul routes are currently "impassable."

270.   Further, the BLM fails to disclose the Project area's baseline total linear road miles or density in NCDE Zone 1 and fails to adequately disclose the locations of secure habitat or the Project's impacts to secure habitat, as required by the NCDE Conservation Strategy.

271.   Similarly, the BLM violates NEPA and the APA because it fails to take a hard look at impacts to grizzly bears, lynx, wolverine, and elk from road building, road use, or subsequent reclamation.

272.   In sum, the EA fails to satisfy the requirements of NEPA and the APA

because the BLM repeatedly failed to consider relevant factors, ignored important

aspects of the problem, and relied on incorrect assumptions to write off any effects.

## SECOND CLAIM FOR RELIEF

*The Clark Fork Face Project violates FLPMA and the APA*
*because the BLM failed to show that the Project complies*
*with forest and wildlife standards in the Missoula RMP.*

273.   All previous paragraphs are incorporated by reference.

274.   Under FLPMA, all site-specific Project decisions must conform with the

management actions in the Missoula RMP. 43 C.F.R. §§ 1601.0–5(b), 1610.5–3(a).

275.   The term "plan conformance," as defined in the BLM planning regulations,

means either that resource management actions must be "specifically provided for

in the plan, or if not specifically mentioned, shall be clearly consistent with the

terms, conditions, and decisions of the approved plan." *Id*. § 1601.0–5.

276.   In addition to the FLMPA violations regarding Canada lynx as described

below, the BLM also fails to demonstrate the Project's compliance with important

wildlife standards in the RMP designed to protect mature trees, grizzly bears,

wolverine, elk, and other wildlife, in violation of FLPMA and the APA.

277.   The RMP incorporates the NCDE Grizzly Bear Conservation Strategy.

278.   The NCDE Grizzly Bear Conservation Strategy states that on BLM lands,

"There will be no net increase in linear miles or density of roads that are open for

public motorized use during the non-denning season in Zone 1."

279.   At the project-level, the BLM must follow the Conservation Strategy and the RMP, which both recognize that roads pose significant threats to grizzly bears.

280.   The RMP directs the agency to "[m]anage BLM-managed lands within NCDE Zone 1 so there shall be no net increase above the 2011 baseline (1.70 mi/mi2) in open motorized route density (roads and trails) open to public during the non-denning season (April 1 to November 30)."

281.   The EA discloses a high open road density in the planning area, generally, but fails to include a baseline accounting of the total linear miles of roads or the road density on BLM-managed lands within NCDE Zone 1.

282.   An unknown number of Project haul routes are currently "impassable" due to previously constructed berms and/or rocks and revegetation and will require various levels of reconstruction before they are useable.

283.   The Conservation Strategy instructs that "impassable roads" bladed before use must be included in project-level road density calculations and analyzed.

284.   The EA does not analyze the impact of opening impassable roads for Project use and/or public use. Because the use of these roads does create a change on the ground, the BLM fails to demonstrate that the Project will not contribute to an increase in miles of road in NCDE Zone 1, in violation of the RMP.

285.   Thus, the EA fails to demonstrate compliance with the Grizzly Bear

Conservation Strategy and the RMP, in violation of FLPMA and the APA.

286.   The BLM also fails to demonstrate that the Project complies with wildlife standards in the Missoula RMP, including those specific to big game habitat.

287.   The RMP includes wildlife management actions designed to ensure that connectivity and wildlife corridors are protected (WL-MA-8) and impacts to special status species and their habitats are avoided, minimized, or otherwise mitigated, particularly during the breeding and winter seasons (WL-MA-2).

288.   However, the EA fails to reference these management actions or discuss how the Project will meet these conservation measures with any specificity.

289.   The RMP also includes big game management actions to maintain adequate hiding and thermal cover habitat components and security habitat and mature trees, including WL-MA-12 (across cool/moist habitat groups for summer and fall habitat), WL-MA-12 (across warm/dry habitat groups for winter range), WL-MA-16 (retain large blocks of big game security habitat), and FV-MA-8 (mature trees).

290.   But the EA neither discusses whether the Project will maintain hiding and thermal cover habitat components near quality elk summer and fall habitat nor disclose where the quality elk forage in winter range exists or whether treatments will meet the conditions required by this standard.

291.   Similarly, the EA does not indicate whether the Project will retain any large blocks of big game security or maintain mature forest structures.

292.   In sum, because the BLM fails to demonstrate compliance with the RMP, the Project violates FLPMA and is arbitrary and capricious under the APA.

### THIRD CLAIM FOR RELIEF

*The Missoula RMP and the Clark Fork Face Project violate NEPA, FLMPA, and the APA because the BLM failed to properly map lynx habitat and failed to adequately consider Project impacts to Canada lynx and Canada lynx Critical Habitat.*

293.   NEPA requires the BLM carefully consider detailed information concerning significant environmental impacts and to provide enough relevant information for the public to play a role in decision making and implementation of that decision.

294.   The BLM failed to adequately discuss or disclose how it defined and mapped "lynx habitat" in the Missoula RMP EIS; therefore, the RMP violates NEPA and the APA. The BLM is required to supplement the RMP EIS to take a hard look at the impacts of its mapping of lynx habitat, and allow the public the opportunity to comment on the agency's mapping of lynx habitat.

295.   Additionally, the RMP EIS fails to take a hard look at the impacts of exempting lynx habitat within the WUI and FMZ 1 to lynx and lynx Critical Habitat, in violation of NEPA and the APA.

296.   At the Project level, the BLM violates NEPA and the APA by failing to take a hard look at the impacts to lynx and lynx Critical Habitat of Project activities when combined with other reasonably foreseeable actions.

297.   The BLM's mapping of lynx habitat for the Clark Fork Face Project violates NEPA, FLPMA, and the APA because it fails to adequately discuss and disclose whether the lynx habitat mapped in the Project EA is consistent with the lynx habitat identified in the RMP EIS.

298.   Further, the BLM utilizes an arbitrarily narrow definition of "lynx habitat," thereby removing a significant amount of potential lynx habitat from Lynx Assessment conservation measures, in violation of NEPA and the APA.

299.   The EA states that according to the RMP, 5,064 acres of BLM-owned land in the Project planning area are considered WUI.

300.   However, the BLM's new "functional WUI" definition greatly expanded the WUI for the Project from that which was defined in the RMP to include "effectively . . . the entire planning area."

301.   This expanded definition of the WUI results in the BLM prioritizing fuels reduction treatments on significantly more acres than were contemplated or authorized by the RMP, and it exempts the vast majority of the Project area from Lynx Assessment conservation measures.

302.   Further, the Project's over-inclusive WUI definition, in and of itself, is not supported by law.

303.   Relatedly, based on these definitions and the BLM's unsubstantiated assumption that lynx will be able to easily move to other areas to avoid

disturbances during Project implementation, the EA's deficient effects analysis greatly minimizes the Project's impacts to lynx.

304.   In sum, first, the BLM failed to adequately define and map lynx habitat in the RMP, in violation of NEPA. Second, the BLM again failed to properly define and map lynx habitat in the Project EA, and it arbitrarily remapped the WUI for the Project without NEPA review. Thus, the BLM failed to follow the procedure prescribed by law and failed to take a hard look at the Project's impacts to lynx and lynx Critical Habitat in violation of NEPA and the APA.

305.   The BLM's arbitrary definition of "current lynx habitat" and over-inclusive definition of WUI together allow the BLM to exempt vast areas of potential lynx habitat from important conservation measures in the Lynx Assessment that were adopted in the RMP. Because its mapping of lynx habitat and WUI is arbitrary and capricious, the BLM cannot demonstrate compliance with the RMP requirements for lynx, in violation of FLMPA.

## FOURTH CLAIM FOR RELIEF

*The Clark Fork Face Project violates NEPA because*
*the BLM failed to take a hard look at climate impacts.*

306.   All previous paragraphs are incorporated by reference.

307.   "Climate change is having, and is expected to continue to have, alarming effects on our environment." *350 Montana v. Haaland*, 50 F.4th 1254, 1266 (9th Cir. 2022).

308.   Effects under NEPA include both beneficial and detrimental effects. 42 U.S.C. § 4332(C).

309.   When considering the effects of a project, agencies must "ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents." *Id*. § 4332(D).

310.   The Clark Fork Face Project EA's climate analysis lacks scientific integrity.

311.   In the EA, the BLM determined that by cutting down thousands to tens of thousands of acres of trees, the Project "will have a beneficial impact on greenhouse gas emissions" under the assumption that unless the forest is heavily logged and burned every last tree will surely be reduced to ashes in a forest fire.

312.   Yet, the agency failed to disclose any negative climate impacts of the Clark Fork Face Project, such as the Project's immediate impacts to carbon storage and sequestration, or the climate pollution impacts of project implementation—the use of fossil fuel engines to build roads, cut trees, and remove and transport cut logs to mills—compared to the no action alternative.

313.   The BLM's decision to completely ignore the Project's negative climate impacts is misleading and its analysis is incomplete. Thus, the BLM failed to take a "hard look" at the Project's climate impacts, in violation of NEPA and the APA.

## VII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.    Declare that the RMP and Project decision violate the law;

B.    Vacate the Project decision and/or enjoin implementation of the Project;

C.    Require the BLM to supplement the RMP EIS to address deficiencies regarding lynx habitat mapping;

D.    Award Plaintiffs costs, expenses, and reasonable attorney's fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other statute; and

E.    Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 3rd day of December, 2024.

_/s/ Kristine M. Akland_
Kristine M. Akland
CENTER FOR BIOLOGICAL DIVERSITY

Alizabeth A. Bronsdon
BRONSDON LAW FIRM, PLLC
_Attorneys for Plaintiffs_