IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*<br><br>        Plaintiffs,<br><br>v.<br><br>ERIN CAREY, in her official capacity as the Missoula Field Manager of the Bureau of Land Management, *et al.*<br><br>        Defendants. | CV 24–168–M–DLC<br><br>ORDER |

This matter comes before the Court on Cross-Motions for Summary

Judgment filed by Plaintiffs Center for Biological Diversity, Alliance for the Wild

Rockies, Native Ecosystems Council, Council on Wildlife and Fish, and

Yellowstone to Uintas Connection  (collectively "Plaintiffs") (Doc. 20), and

Defendants Erin Carey, in her official capacity as the Missoula Field Manager of

the Bureau of Land Management ("BLM"), Sonya Germann, in her official

capacity as the Montana/Dakotas State Director, Tracey Stone-Manning, in her

official capacity as Director of the BLM, the BLM, United States Fish and Wildlife

Service ("FWS"), and the Montana Department of Natural Resource Conservation

(collectively "Federal Defendants") (Doc. 27). Also before the Court is Plaintiffs'

Motion to Supplement. (Doc. 23.) For the reasons herein, judgment will be entered

in favor of Defendants and Plaintiffs' Motion to Supplement will be denied.

## BACKGROUND[1]

On April 18, 2024, the BLM Missoula Field Office authorized the Clark Fork Face Forest Health and Fuels Reduction Project (the "Clark Fork Face Project" or the "Project") in the Clark Fork River sub-basin and Garnet Mountain Range east of Missoula, Montana. Historic development has effectively transitioned "the entire planning area to Wildland-Urban Interface ("WUI") when measured as a proximity to structures." BLM000022. The Project seeks to (1) reduce forest fuel loading and break up homogenous stand conditions, (2) increase the acreage of forest communities moving towards the midpoint of natural range of variability, (3) maintain and enhance limber pine populations where present, and (4) where feasible and appropriate, provide opportunities for timber harvest including salvage of dead timber while it remains salvageable. BLM000307. The Project entails fuel management efforts, limber pine enhancement, prescribed burning, thinning, timber harvest, and temporary road construction on 16,689 acres of BLM-managed lands. BLM000308–10.

The Project will remove an estimated four million board feet of timber per year over its 10 to 15-year lifespan. BLM000315, 56. The Project is further

---

[1] The administrative record is cited as "BLM[Bates No.]" for BLM documents and "FWS[Bates No.]" for Fish and Wildlife Service documents.

estimated to yield $70.6 million in local income, $8.8 million in local tax revenue, and to provide 970 jobs per timber sale annually. (Doc. 38-2 ¶ 7.) The first timber sale, Wallyhood, was awarded in the fall of 2024 and involved the harvest of 3.25 million board feet of timber. (*Id.* ¶ 6.) The timber sale included fifteen miles of road maintenance and drainage improvement on roads that serve public recreational access and benefit approximately 23 private residences. (*Id.*) Planned activities for the upcoming summer include road maintenance and testing as well as non-commercial tree thinning. (Doc. 38-1 ¶ 13.)

The Project implements directives from the Missoula Resource Management Plan ("Missoula RMP" or "RMP"), which BLM finalized in January 2021. BLM000482–680. The Missoula RMP provides direction for future BLM actions across a broader planning area located primarily in Granite, Missoula, and Powell Counties. BLM000491. BLM thereafter prepared an Environmental Impact Statement ("EIS") for the Missoula RMP, BLM00681, and an Environmental Assessment ("EA") for the Project, the latter of which documented BLM's reasons for not preparing an EIS, BLM000329. FWS also prepared two biological opinions ("BiOp") examining the effects of the RMP on each listed species and designated critical habitat within the planning area. FWS000216. FWS determined that implementing the RMP's directives was not likely to jeopardize the continued existence of grizzly bear, FWS000244, Canada lynx, FWS000264, or bull trout,

FWS000387, nor was it likely to destroy or adversely modify critical habitat for lynx and bull trout, FWS000285, 389. With respect to the grizzly bear, FWS issued an Incidental Take Statement ("ITS") with the RMP BiOp to establish three surrogate measures for take. FWS000292–95.

The RMP BiOp anticipates that FWS would tier to the programmatic analysis for site-specific, project level analyses. FWS000214, 312. On April 28, 2022, BLM prepared a Biological Assessment ("BA") for grizzly bears, Canada lynx, and lynx critical habitat, FWS000158–210; FWS000031, and supplemented these documents on several occasions through October 20, 2022, FWS000031. BLM's analyses found that the Project was likely to adversely affect grizzly bears, Canada lynx, and lynx critical habitat, and would have no effect on bull trout or designated bull trout critical habitat. FWS000031. FWS thereafter issued a consultation document for the Project that was first published on November 8, 2022, and corrected on February 6, 2023. FWS000084–133; FWS000031–80. The consultation document included a BiOp regarding the effects of the Project on grizzly bears, FWS000039–80, which made a no jeopardy finding for grizzly bears, FWS000068. With respect to Canada lynx and lynx critical habitat, FWS determined that the site-specific effects of the Project fell within those analyzed in the BiOp for the Missoula RMP, and concluded that the Project would not jeopardize Canada lynx or destroy or adversely modify lynx critical habitat.

4

FWS000034, 37.

Plaintiffs filed their initial Complaint on December 3, 2024, (Doc. 1) and a First Amended Complaint ("FAC") on February 6, 2025 (Doc. 14). The FAC alleges as follows: (1) the Project violates the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") because the BLM failed to take a "hard look" at the Project's impacts to the environment (Count I); (2) the Project violates the Federal Land Policy and Management Act ("FLPMA") and the APA because the BLM failed to show that the Project complies with forest and wildlife standards in the RMP (Count II); (3) the Missoula RMP and Project violate NEPA, FLPMA, and the APA because the BLM failed to properly map lynx habitat and failed to adequately consider Project impacts to Canada lynx and their critical habitat (Count III); and (4) the Project violates NEPA because the BLM failed to take a hard look at climate impacts (Count IV). (Doc. 14 ¶¶ 296–352.) The FAC further alleges (5) that the Missoula RMP BA, BiOps, and ITS violate the ESA and the APA (Count V); and (6) that the Project BA, BiOps, and Incidental Take Statements violate the ESA and APA (Count VI). (*Id.* ¶¶ 353–95.)

Plaintiffs filed a Motion for Summary Judgment[2] and Motion to Supplement

---

[2] Plaintiffs' Motion for Summary Judgment did not present any argument to support Counts IV and VI with respect to the North American wolverine. Because Plaintiffs are not pursuing these claims, they are deemed abandoned and the Court enters summary judgment in favor of Defendants on Count IV and Count VI with respect to the wolverine. *See Doty v. Cnty. of Lassen*, 37 F.3d 540, 548 (9th Cir.

on April 10, 2025, (Docs. 20, 23), and Defendants filed a Cross-Motion for Summary Judgment on May 9, 2025 (Doc. 27). On May 16, 2025, Plaintiffs filed a Motion for Preliminary Injunction, which this Court denied after oral argument. (Docs. 45, 48.)

**LEGAL STANDARDS**

### I.    APA

The APA requires a reviewing court to set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Id.* "It is well-established that an agency's action must be upheld, if at all, on the basis articulated

---

1994) (failure to brief an issue waives a party's right to appeal the issue).

by the agency itself." *Id.* A court may not accept an agency's post hoc rationalizations for its action. *Id.* at 50.

## II.   ESA

ESA Section 7 requires federal agencies to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" designated critical habitat. 16 U.S.C. § 1536(a)(2). The agency proposing the action ("action agency") must consult with FWS whenever an action "may affect" listed species or critical habitat. 50 C.F.R. §§ 402.13, 402.14. Where the action agency determines the proposed action will not affect a listed species or critical habitat, consultation is not required. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447–48 (9th Cir. 1996).

Where an action may affect listed species or critical habitat, the action agency may prepare a biological assessment to evaluate the potential effects of the proposed action on a listed species or critical habitat. 50 C.F.R. § 402.12. If, during informal consultation, FWS concurs with the action agency that the proposed action is not likely to adversely affect listed species or critical habitat, no further action is necessary. *Id.* If the proposed action is likely to adversely affect a species or critical habitat, then the action agency formally consults with FWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Formal consultation results in the issuance of a

biological opinion, including FWS's conclusion as to whether the proposed action is likely to jeopardize the continued existence of a listed species or result in destruction or adverse modification of critical habitat. 50 C.F.R. § 402.14(g). FWS may also issue an "incidental take statement," which exempts the action agency from liability for taking a species under Section 9. 16 U.S.C. § 1536(b)(4). An incidental take statement includes the impact of an anticipated take, measures to mitigate such impact, and terms and conditions to implement those measures. 50 C.F.R. § 402.14(i)(1). If take exceeds the amount or extent specified in the ITS, the action agency must reinitiate consultation. *Id.* § 402.14(i)(5).

ESA claims are reviewed under the APA standard, "[i]rrespective of whether an ESA claim is brought under the APA or the citizen-suit provision." *All. for the Wild Rockies v. Krueger*, 664 F. App'x 674, 675 (9th Cir. 2016) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011)).

### III.   NEPA

NEPA is a procedural statute designed to foster informed decision-making by federal agencies. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Under NEPA, an agency may prepare an environmental assessment to determine whether a proposed agency action may have "a reasonably foreseeable significant effect on the quality of the human environment," in which instance an environmental impact statement is required. 42 U.S.C. § 4336(b)(2).

An environmental assessment is "a concise public document prepared by a federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." 42 U.S.C. § 4336(b)(2). If an environmental assessment results in a finding of no significant impact, no further study of environmental impacts is needed. *See* 42 U.S.C. § 4332(2)(C).

Under NEPA, courts must ensure that the agency "has taken a 'hard look' at the environmental consequences of its proposed action." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). Courts must consider "whether the [agency's] decision was based on a consideration of the relevant factors, or whether its actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. In order to take "the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data." *Native Ecosystems Council v. USFS*, 418 F.3d 953, 964 (9th Cir. 2005); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022) (agencies fail to take a "hard look" when there are "gaps and errors underlying the agencies' assumption[s]"). The omission of a relevant factor violates NEPA's "hard look" requirement. *Robertson*, 490 U.S. at 349.

Furthermore, "[g]eneral statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive

information could not be provided." *Te-Moak Tribe v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010). The agency must "articulate[] a rational connection between the facts found and the choice made." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012). Therefore, an agency fails to take a "hard look" when it presents information that is "so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of alternatives." *Native Ecosystems*, 418 F.3d at 964–65.

## IV.    Federal Land Policy Management Act

FLPMA establishes requirements for land use planning on public lands. 43 U.S.C. §§ 1701–87. Under FLPMA, the BLM is required to "'develop, maintain, and when appropriate, revise land use plans' to ensure that land management be conducted 'on the basis of multiple use and sustained yield.'" *Or. Nat. Res. Council Fund. v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations omitted). Once a land use plan is developed, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5–3(a). BLM has "a great deal of discretion in deciding how to achieve" compliance with the applicable land use plan. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004).

## V.    Summary Judgment

The court can resolve an issue summarily if "there is no genuine dispute as

10

to any material fact" and the prevailing party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

## I.     Motion to Supplement

Plaintiffs seek to supplement the Administrative Record with the Coyote Greenough Project Environmental Assessment ("Coyote Greenough EA") pursuant to the Ninth Circuit's ruling in *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) due to the Agencies' alleged failure to consider all relevant factors, including known timber projects occurring within the Project area. (Docs. 23 at 2–3; 24-1.) Defendants oppose supplementing the Administrative Record, but do not object to the Court taking judicial notice of the EA as a public document. (Doc. 23 at 2.)

In general, a court's review of an agency decision under the APA is limited to the record before the agency when the decision was made. *Citizens to Preserve*

11

*Overton Park v. Volpe*, 401 U.S. 402, 419–20 (1971). In *Lands Council*, the Ninth

Circuit articulated a limited exception to this general rule, holding that:

> In limited circumstances, district courts are permitted to admit
> extra-record evidence: (1) if admission is necessary to determine
> whether the agency has considered all relevant factors and has
> explained its decision, (2) if the agency has relied on documents
> not in the record, (3) when supplementing the record is
> necessary to explain technical terms or complex subject matter,
> or (4) when plaintiffs make a showing of agency bad faith.

395 F.3d at 1030. "Keeping in mind the Supreme Court's concerns with reviewing

court factfinding, [the Ninth Circuit] approache[s] these exceptions with caution,

lest 'the exception . . . undermine the general rule.'" *Id.*

The Coyote Greenough Project is a forest management program developed

by the Montana Department of Natural Resource Conservation ("DNRC"). (Docs.

25 at 3; 23; 24-1.) It proposes approximately 1,778 acres of timber harvest, 700

acres of pre-commercial thinning, and 8.1 miles of permanent road construction.

(Doc. 24-1 at 4.) The treatments included in the Coyote Greenough Project are not

on BLM land, where the activities proposed by the Clark Fork Face project will

take place. (Docs. 24-1 at 3; 25 at 3.) Montana DNRC published the final Coyote

Greenough EA in April 2023, several months after FWS issued the Project's BiOp

in February of that same year. (Docs. 24-1 at 1; 25 at 4.) Plaintiffs argue that

admission of the Coyote Greenough EA is necessary to explain the Agencies'

failure to consider all relevant factors and to provide adequate explanations for

their decisions. (Doc. 24 at 7.) The Court disagrees. The two projects exhibit only modest overlap, and supplementing the record would distract from as opposed to benefit the Court's analysis of the Clark Fork Face Project. *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006) ("extra-record evidence . . . does not assist in understanding either the subject matter of this case or BLM's decision."). However, the Court finds that it may consider the Coyote Greenough EA's relevance to the Agencies' compliance with their statutory obligations—particularly with respect to cumulative effects—by taking judicial notice of the document. Therefore, although the Court will deny Plaintiffs' Motion to Supplement, it will nonetheless take judicial notice of the Coyote Greenough EA (Doc. 24-1.)

## II.    Grizzly Bear ESA Claims

Grizzly bear populations across the contiguous United States have been listed as threatened since 1975. BLM006153. Grizzly bears that exist in the Project area are part of the Northern Continental Divide Ecosystem ("NCDE"), which covers approximately 5.7 million acres of land. FWS000045, FWS000067. Within the NCDE, grizzly bear habitat is managed under several different management zones, FWS000508, the most protective of which is the Primary Conservation Area, also referred to as the recovery zone, FWS001345. Outside the recovery zones, Zones 1, 2, and 3 provide varying levels of habitat protection and

13

management emphasis. FWS000508. "Grizzly bears may be present within NCDE Zone 2 but are likely at lower densities than NCDE Zone 1." FWS000046. Most of the Project area falls within NCDE Zone 2, with the northwestern and eastern portions of the Project falling within Zone 1. BLM002034. A few treatment areas in the south of the Project area fall outside any grizzly management zone. *Id.* FWS concluded that the Clark Fork Face Project "would not appreciably reduce the likelihood of both the survival and recovery" of the grizzly bear. FWS000063.

Plaintiffs make three arguments with respect to grizzly bears: (1) that the Project's BiOp failed to consider that "blading and shaping" the impassable old roads may affect grizzly bears "in a manner or to an extent not previously considered" because at least some of the proposed haul routes currently prohibit all motorized access; (2) that the Agencies must reinitiate consultation on the RMP's impacts to grizzly bears because approximately 19 miles of undetermined roads and an undisclosed number of impassable roads "exist" across the Project area, which will increase the road density above the 2011 baseline and result in a violation of the RMP BiOp's first surrogate measure of take; and (3) that the Project will construct four miles of temporary roads in NCDE Zone 2, BLM001998, thereby violating the RMP BiOp's second surrogate measure of incidental take. (Doc. 21 at 14–15.) The Court will address each argument in turn.

14

### A. Whether the Project BiOp Fails to Adequately Consider Important Factors and Discuss Project Effects on Grizzly Bears

Pursuant to the ESA, biological opinions must include: (1) a summary of the information upon which the opinion is based; (2) a detailed discussion of the environmental baseline of the listed species and their critical habitat; (3) a detailed discussion of the effects of the action on listed species or their critical habitat; and (4) whether the action is likely to jeopardize the existence of a listed species or result in the destruction or adverse modification of critical habitat. 50 C.F.R. § 402.14(h). In undertaking this analysis, "the ESA requires the biological opinion to analyze the effect of the entire agency action." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). The failure to address effects and consider important factors, including conservation measures, renders the biological opinion arbitrary and capricious. *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1121 (9th Cir. 2012).

Plaintiffs argue the consultation documents fail to disclose or consider the current conditions of the proposed haul routes and to acknowledge or discuss the impacts to grizzly bears from reconstructing roads that have become revegetated and "impassable." (Doc. 21 at 16.) Relying primarily on a Declaration documenting counsels' recent bike ride through the Project area, Plaintiffs contend that while BLM claims the Project will utilize only "existing roads" as haul routes, BLM000062, an undisclosed number of these "existing roads" are in fact

15

"impassable," as evidenced by photographs taken on counsels' bike ride. (Doc. 21 at 16 (citing Doc. 21-1 ¶¶ 7–10.).) Plaintiffs contend that the Agencies failed to consider the current conditions of the proposed haul routes and the impacts to grizzly bears from reconstructing these "impassable" roads. (Doc. 21 at 16.) In other words, Plaintiffs argue, because these "existing" but "impassable roads" are inaccessible to humans and motorized use, they are currently providing habitat security; however, to make them useable for Project activities, the BLM must employ heavy machinery to churn up soil, remove large boulders, and cut down trees. (Doc. 21 at 18.)

As an initial matter, counsel's Declaration (Doc. 21-1) is not properly before this Court.[3] Because review is limited to the administrative record and the conditions before the agency during consultation, Plaintiffs' reliance on these extra-record documents—which include photographs taken two years after the Agencies' ESA consultation—is inappropriate. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 604 (9th Cir. 2014) ("post-decisional information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision") (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,

---

[3] Plaintiffs provide no argument or basis upon which this Court may consider the Akland Declaration. (Doc. 35 at 7); *see Lands Council*, 395 F.3d at 1030 (permitting "expansion of the administrative record in four narrowly construed circumstances").

16

100 F.3d 1443, 1450 (9th Cir. 1996)).

Notwithstanding the above, the Court must still consider whether, on the record currently before it, Project BiOp properly considered the effects of roads and potential roadwork in the Project area on grizzly bears. To address this question, the Court begins with a review of BLM-specific terminology.

First, "open road" means "[o]pen year-round to the public." BLM0000597. "Road density" calculates the "[n]umber of miles of open road per square mile." *Id.* "Impassable road" is "[a] road that has been treated in such a manner that the road is blocked and there is little resource risk if road maintenance is not performed on a regular basis (self-maintaining)." *Id.* "Roads may become impassable as a result of a variety of means, including but not limited to one or more of the following: natural vegetation growth, road entrance obliteration, scarified ground, fallen trees, boulders, culvert or bridge removal, etc." *Id.* "Impassable roads may remain on the inventoried road system if use of the road is anticipated at some point in the future." *Id.* Importantly, pursuant to these definitions, an "open road" does not mean that the road is necessarily "passable." Lastly, "open motorized road density" ("OMRD") means "[r]oads and motorized trails that are open to wheeled motor vehicle use by the public for any part of the non-denning season," and "open motorized road density in NCDE Zone I" is "1.70 miles/miles squared defined as conditions on existing BLM-administered public

lands as of 12/31/2011[.]" *Id.*; BLM005286.

Returning to Parties' arguments, the Court is satisfied that all inventoried roads governing the region's travel management plan were included in the area's road density calculations. The administrative record is clear in that the Project will not alter the motorized status of any existing roads, BLM000062; BLM000313, meaning the baseline conditions examined in the RMP and Project BiOp accounted for the fact that Project roads may sustain motorized access, BLM002030; BLM002774; BLM004755; BLM006159. An agency is required to take affirmative actions to alter travel management designations before a road is no longer counted in road density analysis. BLM000542. And although Plaintiffs take issue with the current habitat security allegedly provided by the photographed "impassable" roads, the Project BiOp accounted for potential impacts of motorized use along those same roads. Therefore, as Federal Defendants maintain, "[t]o the extent the Project returns haul roads to a motorized state, it is merely realigning the conditions on the ground with those evaluated during ESA consultation." (Doc. 28 at 15.)

Furthermore, as discussed above, the Court rejects Plaintiffs' invitation to ignore a road's inventoried classification system and to instead look to its current vegetative state, not the state of the Project area during ESA consultation. Motorized access is determined by the agency, BLM000542, and the agency is

18

directed to monitor motorized route density with databases that map "motorized access, developed sites, and livestock allotments." FWS001492. Indeed, the NCDE Recovery Plan supplement specifically focuses on road density in secure grizzly bear habitat because it is "a predictor of grizzly bear survival on the landscape." FWS001414. An agency's designation, not passive revegetation or erosion, determines motorized road density.

As observed by the Government during oral argument, the land at issue here is unique in that it has been subject to historic mining and timber sales and is far more checker-boarded than, for example, national forest land. In light of the above, the Court finds that the Project BiOp properly analyzed the effects of roads on grizzly bears in the Project area.

### B. Whether the Agencies Must Reinitiate Consultation on the Missoula RMP because the Project Violates the RMP BiOp's Incidental Take Statement for grizzly bears.

ESA Section 9 prohibits "take" of listed species unless such take complies with an ITS under § 7 or an Incidental Take Permit under Section 10 of the ESA. 16 U.S.C. §§ 1536(b)(4), (o)(2), 1538, 1539. Because measuring actual take is difficult, agencies establish surrogate measures associated with adverse effects to the listed species. FWS000291. Here, FWS concluded that "incidental take of adult female grizzly bears would be very low and would occur only infrequently in the form of harm related to the displacement effects of existing high road densities and

19

temporary road construction use." FWS000291. FWS issued an ITS for take of grizzly bears that may be caused by implementation of the Missoula RMP. FWS000289–95. The ITS sets forth two surrogate measures of take for grizzly bears: the first limits open and total road density, and the second limits total linear miles of temporary road construction. FWS000292–93. Reinitiation of consultation is required if any BLM-approved activities exceed one or both surrogate measures of take. 50 C.F.R. § 402.16(a)(1).

Plaintiffs argue that by adding existing roads to the Project area, the Agencies will exceed the RMP's first and second surrogate measures of incidental take for grizzly bears and must reinitiate consultation. (Doc. 21 at 21, 24.) The Court will first address whether the Project violates the RMP BiOp's first surrogate measure of incidental take.

### 1.  First Surrogate Measure of Take

The RMP BiOp uses "the existing miles of open motorized routes and the open and total linear road density within the five geographic areas of the action area" as its "first surrogate measure[] of incidental take of grizzly bears related to motorized access." FWS000292. The ITS provides that if permanent increase[s] in motorized road density occur over the first surrogate measure of take, or if miles of temporary road construction is higher than anticipated by the second surrogate measure of incidental take, then the anticipated level of incidental take will be

20

exceeded. *See* FWS000292–93. "[T]emporary roads," however, will "not result in an increase in the amount of permanent roads post-project." FWS000292.

BLM reports a "relatively high" OMRD baseline of 2.46 miles/sq. miles across the planning area, with an OMRD of 3.49 miles/sq. miles on BLM-managed lands. BLM000108; FWS00183. The Project predicts that "[c]urrent [OMRD] densities within the NCDE [Z]one 1 would be maintained and managed for no net increase above the 2011 baseline [OMRD], as described in the NCDE." FWS000289. While analyzing the Project, BLM identified approximately 19.35 miles of BLM-managed roads that were not included in the agency's Facility Asset Management System ("FAMS") database. BLM000062. These roads are designated as "Haul-Add to BLM System." BLM-SUPP-000014–18.

Plaintiffs first argue that the Project violates the BiOp's first surrogate measure of incidental take and fails to discuss how these newly-discovered 19.35 miles will affect road density and grizzly bears existing on the landscape. (Doc. 21 at 21–22.) Next, relying on *Alliance for the Wild Rockies v. Marten*, 2021 WL 3561178, at * 14 (D. Mont. Aug. 11, 2021), Plaintiffs further argue that FWS failed to disclose or discuss the current condition of these 19.35 miles of "undetermined" roads, which is an important part of the problem because grizzly bears are not experiencing the same adverse impacts as if the roads were maintained. (Doc. 21 at 22–23.) In *Marten*, this Court found that the effects of

21

newly discovered roads in the Project area "may affect grizzly bears or their habitat to an extent the Forest Service had not previously considered." 2021 WL 3561178, at *14, *findings and recommendation adopted in full by* 2021 WL 4551496 (D. Mont. Oct. 5, 2021). In reaching this conclusion, the Court reasoned that because the effects from roads on grizzly bears was significant, "it therefore follows that the discovery of 137 miles of roads in the National Forest are an important consideration when evaluating effects on grizzly bears." *Id.* This Court ordered the Forest Service to reinitiate consultation "to determine the extent of the effect of the undetermined roads on grizzlies." *Id.* at *16.

To begin, the Court is not persuaded that the addition of these 19.35 miles of roads to the FAMS database violates the first surrogate measure of incidental take.[4] Relevant here, the Missoula RMP directs the agency to "[u]pdate and maintain the road and trail database to correct mapping errors," BLM000542, and consistent with that directive, the agency added the newly-discovered 19.35 miles to the FAMS database and included the additional mileage in all Project analyses, *see* BLM000062; BLM002770–71 ("[I]nclusion in FAMS is a management tool to aid

---

[4] During oral argument, counsel for Plaintiffs argued that because the record fails to indicate whether these roads will be closed to the public following completion of the Project, that means they will be open to public use. However, as counsel acknowledged, these roads are currently designated as closed to public use. The fact that roads may be used as haul roads for purposes of the Project does not transform those roads into roads open for public use.

in the implementation of route-related decisions such as administration, maintenance, emergency repair, etc."). Although the 19.35 miles were not initially included in the FAMS database, more than 13 of those miles were still included in the RMP's public-facing mapping inventory and were designated as closed to public use. *See* BLM002712–68. The remaining 5.6 miles were inadvertently excluded from that map. *See id.*

Importantly, the discovery of these 19.35 miles—including the 5.6 miles initially excluded from the public-facing mapping inventory—does not alter the OMRD in the Project area. The amended ITS adjusted the total motorized linear road density in the area from 3.1 to 3.2 miles/sq. mile. FWS000083. The 2021 total linear mileage associated with the Garnet area in 2021 was 374.8 miles. FWS000083; FWS000292. Accounting for the excluded 5.6 miles and adjusting, as per the RMP, to the nearest tenth, the total linear road density is 3.2 miles, a number still within the confines of the ITS. *See* FWS000292 (dividing 19.35 and 374.8 miles by 122 sq. miles). This calculation assumes that none of 19.35 miles were included in the RMP's road density analysis; however, as discussed, the travel management map forming the basis of RMP's road density calculations included all but 5.6 miles of the newly inventoried roads.[5] Indeed, according to the

---

[5] This travel map is publicly available at https://www.blm.gov/sites/default/files/docs/2025-05/Travel_Map_West_2020_v0.1.pdf (last accessed March 24, 2026). The Court

BLM, "zero miles of new open motorized routes are proposed" under the Project, BLM000061–62, and none of the 19.35 miles are designated as open to public use, BLM002712–68. In any event, the RMP ITS accounts for the fact that mapping errors mileage calculations may arise, and this factor was incorporated into the ITS's total road density. FWS000292. A mapping error is therefore not a triggering event for an incidental take pursuant to the RMP ITS. *See id.*

The Court is also not persuaded that FWS failed to adequately discuss the current condition of this additional mileage. Unlike *Marten*, 2021 WL 4551496, which entailed the agency's failure to address 137 miles of "undetermined" roads, the 19.35 miles at issue here are closed to public use. BLM002712–68. Moreover, unlike *Marten*, wherein the agency failed to consider how an additional 137 miles of roads might affect grizzly bears, here, the Project BiOp examined the effects of adding new roads that may raise total motorized linear density by .1 miles/sq. mile, and FWS issued an ITS permitting such an increase. FWS000083.

In consideration of the above, the Court finds that the Agencies did not violate the first surrogate measure of take.

### 2.  Second Surrogate Measure of Take

Plaintiffs next argue that the Project violates the RMP BiOp's second surrogate measure of incidental take (Doc. 21 at 24), which limits new temporary

---

takes judicial notice of the map pursuant to Federal Rules of Evidence 201(b)(2).

road construction in NCDE Zone 1 to seven miles and in NCDE Zone 2 to two miles, FWS000293. As Federal Defendants acknowledge, at first glance, it appears the Project violates the Missoula RMP BiOp's second surrogate measure of take for NCDE Zone 2. (Doc. 28 at 23.)

However, upon review of the Project Record, it is apparent that FWS thoroughly analyzed the proposed road construction and explained that only .33 miles of temporary roads will be constructed in secure habitat, FWS000055, and that only .18 miles of temporary roads constructed in Zone 2 could adversely affect grizzly bears, FWS000055–56. Secure habitat is "isolated from high levels of human contact" due to its distance from the nearest roadway. FWS000051. FWS concluded that these amounts of temporary roads fell within the second surrogate measure of incidental take found in the Missoula RMP BiOp ITS. FWS000056.

Importantly, "not all effects associated with temporary road construction and use are expected to be adverse," FWS000054, and FWS addressed the following with respect to proposed temporary roads:

> [The roads] are located in areas of existing roaded habitat, wh[ich] grizzly bears are likely already avoiding due to high road densities. In addition, the temporary roads would be on the landscape for a short duration with temporary roads being deconstructed with 36 months of construction. Nearly all proposed temporary roads would be located at the end of existing roads and would dead end, meaning that use would be infrequent and limited because these roads would not connect to other roads. The average segment length of proposed temporary roads is .10 mile (161 m).

25

FWS000055. In the Court's view, given the vital role that secure habitat plays in recovery efforts, the record provides sufficient reasons why the proper number to consider under the ITS is the .18 miles of temporary road construction occurring in secure habitat. FWS reasonably supported its decision to focus on the .18 miles in its determination that the Project complies with the second surrogate measure of take, and "it is necessary to defer to their decision." *See Alliance for the Wild Rockies v. Bradford*, 720 F. Supp. 2d 1193, 1213 (D. Mont. 2010).

### III.   Canada Lynx ESA and NEPA Claims

The southern-most lynx population in Montana exists in the Garnet Range. FWS0005447. The Lynx Conservation Assessment Strategy ("LCAS") was developed to provide a consistent and effective approach to conserve Canada lynx on federal lands, FWS005391, and the BLM considers it the best available science with respect to lynx conservation, FWS005393. The LCAS recommends use of the "lynx analysis unit" ("LAU") as the appropriate scale for investigating the effects of any given project on lynx. FWS005476. "LAUs do not depict actual lynx home ranges, but should approximate the size of a female's home range and contain year-round habitat components." FWS005476. "Maintaining good quality and distribution of denning and foraging resources within a LAU will help to assure survival and reproduction by adult females, which is critical to sustain the overall lynx population." FWS005477.

Under the LCAS, agencies should use "the best available mapping tools, assess the abundance and juxtaposition of lynx habitat, and ensure that adequate amounts of lynx habitat are present within each LAU. If not, [the agency] must redelineate the LAU in coordination with FWS to encompass additional lynx habitat, eliminate the LAU, or combine LAUs as appropriate." FWS005477.

The RMP incorporates the LCAS as an objective to protect lynx and lynx habitat. BLM000530; FWS000296. The RMP exempts "[f]uels treatment projects within the 1-mile [WUI] buffer (approximately 7,548 acres) and Fire Management Zone 1 ("FMZ1") from lynx conservation measures." BLM000030. The WUI was established based upon the Missoula, Powell, and Granite County community wildlife protection plans, BLM000079, whereas FMZ1 lands "are within and adjacent to the WUI, intermingled with private and state lands, and contain important cultural, recreational, economic, or biological resources." BLM000265. As a result of the expansion of subdivisions and rural development, the potential lynx habitat in the planning area is located entirely within the functional WUI because it is located within 1 mile of private structures or within FMZ1. BLM000021–22; BLM000030; BLM000118.

## A. Whether the Project will jeopardize Canada lynx or adversely modify or destroy lynx critical habitat, in violation of the ESA

Plaintiffs argue the Project BiOp on lynx and lynx critical habitat is contrary to the best available science in violation of the ESA and APA. (Doc. 21 at 35.) The

27

Court disagrees. In short, the Agencies utilized a tiered consultation process to examine the effects of the Project on lynx and lynx critical habitat, relying first on the Missoula RMP BiOp and ITS, and second on a Project-specific consultation and concurrence letter. FWS000032; FWS000035. These documents sufficiently analyze and explain why the Project is not likely to jeopardize the continued existence of the Canada lynx and not likely to result in the adverse modification or destruction of lynx critical habitat. *See* FWS000034; FWS000037.

More specifically, the Clark Fork Face Project proposes treatments across four LAUs. FWS000032. The LAUs contain a total of 4,322 acres of snowshoe hare habitat capable of supporting lynx, FWS000138; most of this habitat—4,132 acres—includes trees in the multi-story stand phase, which provides "year-round snowshoe hare habitat via dense horizontal cover," *id.* The Project proposes treatment on 243 of these 4,322 acres. *Id.* The Project will also treat approximately 204 of 2,526 acres that do not presently provide snowshoe hare habitat but qualify as lynx habitat. FWS000138–39. Therefore, as an initial consideration, FWS's conclusion that the Project "complies with the LCAS guidelines to leave substantial areas of lynx habitat untreated" is supported by the record. FWS000033.

With respect to LAU acreage subject to treatment, the RMP BiOp and ITS analyzed the effects of treating up to 5,897 acres of snowshoe hare habitat within

FMZ1 and the WUI buffer zone. FWS000136; BLM000932; BLM005733. And while the RMP BiOp observed that up to 5,897 acres of snowshoe habitat in FMZ1 and WUI zones could be temporarily degraded by fuels management projects, the treated areas would still "have the capacity to produce and support snowshoe hare in the future." FWS000136. FWS observed that the anticipated treatment of 243 acres fell "well within" the 5,897 acres contemplated by the RMP BiOp and ITS. *Id.* With respect to treatments outside the FMZ1 and WUI buffer zone, BLM implemented design features intended to conserve the horizontal cover in order to promote lynx habitat, BLM001989, such as retaining trees to offer understory snowshoe hare habitat, BLM001988. Areas that currently constitute lynx habitat will "not be burned in order to preserve horizontal cover." FWS000136.

Moreover, FWS adequately analyzed its decision to exempt fuel treatment projects within the WUI and FMZ1. Under the exemption, approximately 5,897 acres of lynx habitat "would temporarily [be] impacted (up to 20-30 years)" by fuel treatment projects authorized by the RMP.[6] FWS further explained that winter conditions providing deep, fluffy snow are "a function of topography and climate" and are unaffected by vegetation management activities. FWS000036. FWS noted that denning habitat is "not considered limited in the area and adequate denning

---

[6] The RMP ITS provides that if more than 5,897 acres of lynx habitat are treated within FMZ1 and the WUI 1-mile buffer zone over the life of the RMP, then the level of incidental take would be exceeded. FWS000297–98.

areas would remain post-project." FWS000036. Indeed, only 7% of denning habitat in the Project area is subject to treatment, leaving "[w]idespread, unaffected" lynx denning habitat. FWS000036. FWS incorporated by reference the Missoula RMP BiOp and ITS, examining whether the present "second-tier consultation" was "consistent with the 2020 programmatic biological opinion and associated incidental take statement." FWS000032. ("The intent of this second-tier consultation is to evaluate whether the adverse effects on lynx related to the Clark Fork Face Project are consistent with the 2020 programmatic biological opinion and associated incidental take statement.") Together, these documents sufficiently support FWS's conclusion that the Project is unlikely to jeopardize the continued existence of Canada lynx or the destruction or adverse modification of lynx critical habitat, *see* FWS000034; FWS000037.

Finally, the Agencies appropriately addressed matrix habitat, or what appears to be Plaintiffs' concerns regarding the "juxtaposition" of lynx habitat. (*See* Doc. 21 at 32.) Specifically, as observed by FWS, the Project's "combination of proposed treatments and untreated acreage would provide a mosaic of young and older stands within each LAU while leaving adequate quantities of multi-story habitat for lynx foraging." FWS000137. Projections for the Project area indicate the LAUs will have varied stand structures and will ultimately "provide [an] increase in habitat" for lynx post-completion. FWS000141. Moreover, the BLM

plans to use thinning techniques to create a range of densities within a specific stand, "randomly distribut[ing] gaps and clumps across the treatment areas to emulate natural stand structure." BLM001987–88; BLM000235 (showing an example of the variable density thinning technique in ponderosa pine). The above provides adequate assurance that while Project activities may affect vegetation, it will not affect lynx's ability "to travel through such habitat because the proposed activity is not likely to create a barrier or impede lynx movement between patches of foraging habitat and between foraging and denning habitat within a potential lynx home range." FWS000089. Similarly, although some Project activities will "alter structural stages of potential lynx habitat, it would not result in the construction of any barriers known to inhibit lynx movements and would not reduce habitat connectivity between LAUs." *Id.*

Therefore, the record demonstrates that the agencies properly considered LCAS guidance, examined potential effects, and reasonably concluded that the Project is not likely to jeopardize the continued existence of Canada lynx or result in the destruction or adverse modification of lynx critical habitat.

**B. Whether the BLM failed to take a "hard look" at Project impacts on Canada lynx and its critical habitat, in violation of NEPA.**

To take the required "hard look" at a proposed project's effects, the court must consider "whether the [agency's] decision was based on a consideration of relevant factors, or whether its actions were arbitrary, capricious, an abuse of

31

discretion, or otherwise not in accordance with law." *Blue Mountains Biodiversity Project*, 161 F.3d at 1211. "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification why a more definitive information could not be provided." *Te-Moak Tribe*, 608 F.3d at 603. Plaintiffs argue that the BLM violated NEPA by failing to take a "hard look" at exempting lynx habitat in the WUI and FMZ1 and by failing to consider the juxtaposition of lynx habitat. (Doc. 21 at 28, 32.) The Court disagrees.

The Primary Constituent Element ("PCE") for lynx habitat is defined as "boreal forest landscapes supporting a mosaic of differing successional forest stages and containing: [1] Presence of snowshoe hares and their preferred habitat conditions ('PCE 1a'); [2] Winter snow conditions that are generally deep and fluffy for extended periods of time ('PCE 1b'); [3] Sites for denning that have abundant course woody debris, such as downed trees and root wads ('PCE 1c'); and [4] matrix habitat ('PCE 1d')." BLM000110–11. Because snowshoe hare is the lynx's primary prey, BLM000109, the surrogate measure for harm to lynx or lynx critical habitat is measured by the number of acres of snowshoe hare habitat, or PCE 1a, treated in the Project area. FWS000135–37. As previously discussed, the RMP BiOp found that while treating 5,897 acres of snowshoe hare habitat in FMZ1 and the WUI buffer zone would temporarily affect lynx foraging, the area would provide support for snowshoe hare in the future. FWS000136; FWS000033.

32

The Agencies provided detailed analysis of the impacts to lynx and lynx critical habitat through both the consultation process and the NEPA analyses for the RMP and the Clark Fork Face Project. *See* BLM000912–14 (RMP EIS); BLM000108–11 (Project EA). The EA and consultation documents sufficiently explain why the Project is not likely to jeopardize lynx or result in the destruction or adverse modification of its critical habitat due to the limited treatment of PCE 1a habitat, implementation of Project design features to conserve horizontal cover, lack of impact on PCE 1b habitat, maintenance of adequate denning habitat, and maintenance of connectivity between lynx habitats. BLM000063; BLM000118; BLM000665; BLM001779; BLM001987. Additionally, the EA explains that a dense subdivision development has occurred in the lower areas of several drainages near the Clark Fork River in the planning area, BLM000078; such development has effectively transitioned "the entire planning area to [WUI] when measured as a proximity to structures," BLM000022. In other words, this is not pristine wilderness.

Moreover, as observed by Federal Defendants, the effect of the Project on lynx is best understood within the context of the RMP. (Doc. 28 at 40.) For example, the RMP BiOp observed that while the "revised RMP, along with LCAS conservation measures, clearly conserve and promote snowshoe hare and lynx habitat . . . vegetation and fire management may result [in] some level of adverse

33

effects to lynx, primarily through the temporary removal of the dense horizontal structure of natural forest succession phases and/or altering the mosaics of the forested landscape in localized areas." FWS000262. Because the acreage of treated snowshoe hare habitat is expected to be distributed throughout the action area, FWS determined that adverse effects are likely to affect only portions of any individual lynx home range, and the LAUs are expected to produce adequate densities of snowshoe hare. FWS000263.

With respect to Plaintiffs' juxtaposition argument, the BLM analyzed what it refers to as "matrix habitat," which is land occurring between patches of boreal forest where lynx are likely to travel to access other portions of boreal forests. BLM000111. ("The remaining acres proposed for treatment in LAUs overlapping the lynx analysis area would constitute potential matrix habitat providing landscape connectivity to support lynx population"). BLM further plans to use thinning techniques to create a range of densities within a stand and to "randomly distribute gaps and clumps across the treatment areas to emulate natural stand structure." BLM000062–63; BLM001987–88. "The combination of proposed treatments and untreated acreage would provide a mosaic of young and older stands within each LAU while leaving adequate quantities of multi-story habitat for lynx foraging." FWS000137. As a result, the agency's conclusion that the Project will not affect lynx's ability "to travel through such habitat because the

34

proposed activity is not likely to create a barrier or impede lynx movement between patches of foraging habitat and between foraging and denning habitat within a potential lynx home range" is supported. *See* FWS000036.

As a final note, Plaintiffs protest that the Project EA cannot tier to non-NEPA documents such as the RMP BiOp. (Doc. 35 at 13.) However, the EA did not "tier" to a non-NEPA document, but rather incorporated by reference the RMP BiOp's analysis regarding the effects of the Project on lynx and lynx critical habitat. FWS000032–33; *see* 40 C.F.R. § 1508.28 (defining "tiering"). Although "NEPA and the ESA [clearly] involve different standards, [] this does not require [an agency] to disregard the findings made [] in connection with formal consultation mandated by the ESA." *Env't Prot. Inf. Ctr. v. U.S. Forest Service*, 451 F.3d 1005, 1012 (9th Cir. 2006); *see also Cook Inletkeeper v. Raimondo*, 533 F. Supp. 3d 739, 786 (D. Alaska 2021) (observing that while an EA may rely on analysis in a corresponding BiOp, the BiOp analysis failed to address the project effects at issue).

Courts afford substantial deference to an agency's fact-dependent and context-specific choices about the breadth of inquiries under NEPA, and they should refrain from micromanaging agency decisions, granted those decisions are reasonable. *See Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168, 179–180 (2025) ([U]nder the APA's deferential arbitrary-and-

capricious standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained"). Because BLM's decision with respect to lynx and lynx critical habitat is reasonable and supported by the record, the Court concludes that the agency took a "hard look" at the impacts of the Project on lynx and lynx critical habitat.

### IV.   Bull Trout

#### A. Whether the Agencies' determination that Project activities will have "no effect" on bull trout or bull trout critical habitat is arbitrary and capricious, in violation of the ESA

The record indicates that BLM's early site-specific analysis revealed that the Project will have no effect on bull trout or bull trout critical habitat. *See* BLM000034. Plaintiffs complain that this conclusion is arbitrary and capricious because (1) bull trout "may be present" in the Project area and (2) Project activities are of the type that "may affect" bull trout. (Doc. 21 at 45–47.) The Court will address each argument in turn.

##### 1. Whether bull trout "may be present" in the Project area and whether BLM conducted a sufficient site-specific analysis for the Clark Fork Face Project

"If a [listed] species 'may' be present, the ESA obligates the agency to perform a biological assessment or [e]nter informal consultation with the Wildlife Service to ensure that the proposed action will not adversely affect the listed species." *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1073 (D.

36

Mont. 2013); 16 U.S.C. § 1536(c)(1). The "may be present" question does not require a species to be "actually known or believed to occur" in an area. *Id.*; 51 Fed. Reg 19926–01 (June 3, 1986). Rather, this threshold is met where a migratory or transitory species might travel through an affected area, *id.* at 1073, 1077, or where a listed species "may be present" downstream from a project area and potentially impacted from the project, *see, e.g.*, *Riverside Irrigation District v. Stipo*, 658 F.2d 762, 764 (10th Cir. 1981).

Here, the record reflects that bull trout "may be present" in the Project area, BLM005815, defined as the "Clark Fork drainage from Bonner, MT to Drummond, MT, including Wallace Creek, Bear Gulch, Rattler Gulch and vicinity," FWS000170. The Clark Fork River is designated bull trout critical habitat, BLM002554, and the Blackfoot River is a designated critical habitat "core area," BLM000614.

Plaintiffs argue that despite acknowledging bull trout "may be present" in the Project area, the BLM failed to include bull trout in the BA; as a result, Plaintiffs assert, the BLM improperly found the Project "would not affect" bull trout or bull trout critical habitat because the "species and habitat are not present within the action area." (Doc. 21 at 46–47 (citing FWS000170).) In response, Federal Defendants acknowledge that if an ESA-listed species "may be present" in the action area, the ESA requires the action agency to "conduct a biological

37

assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such an action." (Doc. 28 at 29 (citing 16 U.S.C. § 1536(c)(1).) The analysis pertaining to bull trout, Federal Defendants maintain, took place during formal consultation on the Missoula RMP, and the ESA does not require a duplication of consultation efforts. (Doc. 28 at 29.) It appears that Federal Defendants are correct.

The BLM prepared an initial BA in 2019 examining the effects of agency actions associated with implementation of the Missoula RMP. BLM005923–6091. The BA discovered that management activities were likely to have short-term adverse effects on bull trout and bull trout designated habitat, "but long-term effects would be mitigated to not likely adversely affect bull trout and bull trout designated critical habitat." BLM005981–82. Moreover, during formal consultation with FWS, BLM explained that the RMP's mandatory design features are based on the 2015 Recovery Plan for the Conterminous United States Population of Bull Trout, the 2013 Conservation Strategy for Bull Trout on USFS lands in Western Montana, and the 2014 Updated Interior Columbia Basin Strategy. BLM000034. The RMP further incorporates the programmatic Inland Native Fish Strategy ("INFISH"), which provides direction for the protection of habitat and populations of native resident fish. BLM005940. Subject to alterations during site-specific analysis, INFISH directs how far a "riparian conservation

38

area[]" ("RCA")[7] should extend from any given body of water. BLM000305; BLM000611. Fish-bearing streams, including those that support bull trout critical habitat, require at least a 300-foot buffer from streambanks on either side. *Id*. The RMP requires that projects "ensure [] aquatic habitat is maintained or improved" in accordance with riparian management objectives ("RMOs"), BLM005967, which provide criteria to measure the attainment of or progress toward a healthy riparian ecosystem, BLM000610. "Projects not meeting RMOs w[ill] be terminated or redesigned." BLM005967.

The RMP BiOp concludes that implementation of the Missoula RMP would not jeopardize bull trout or adversely modify or destroy bull trout critical habitat. FWS000389. FWS observed that the "design features and guides in the Revised [RMP]", together with "the small percentages of designated critical habitat on lands administered by the [] BLM[,] are not expected to reduce the conservation value within the critical habitat units" in the planning area. FWS000390. More importantly, consultation on the Missoula RMP was programmatic in nature and anticipated continued site-specific analyses for individual projects where necessary. FWS000361.

Although not ultimately in the form of a BA, the BLM did indeed conduct a

---

[7] The administrative record also refers to RCAs as riparian habitat conservation areas ("RHCAs").

site-specific analysis for the Project. Specifically, the Project EA includes a discussion of the Project's effects on bull trout and bull trout critical habitat, BLM000036–42; BLM002496–2503, and describes the RMP-required design features and mitigation measures set forth above, BLM000042. The BLM further catalogued all streams within the Project area, BLM002464–68, and completed a lengthy analysis addressing potential riparian effects and explaining why further analysis was unnecessary, BLM002557. The record indicates that the agency implemented the necessary design features for riparian areas and followed the RMOs for bull trout. The Court therefore concludes that this site-specific discussion appropriately supplements the effects analysis completed in the Missoula RMP and associated BiOp.

At oral argument, Plaintiffs argued that Federal Defendants' position regarding site-specific analysis was squarely rejected by both this District in *Native Ecosystems Council v. Marten*, 612 F. Supp. 3d 1146, 1161 (D. Mont. 2020), and the District of Idaho in *Friends of the Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1086–87 (D. Idaho 2022). However, unlike in *Native Ecosystems Council* and *Friends of the Clearwater*, a BiOp addressing the Project's effects on bull trout and bull trout critical habitat was completed at the programmatic level. Plaintiffs fail to provide any authority advising that the ESA mandates a duplication of otherwise sufficient consultation efforts contained in the Project BiOp. And although not in

40

the form of a BA, the record here indicates that the BLM conducted a programmatic consultation on bull trout that is sufficiently detailed and supports the agency's "no effect" determination.

### 2. Whether Project activities are the type that "may affect" bull trout

Plaintiffs further disagree with the BLM's determination that Project activities will have "no effect" on bull trout and bull trout critical habitat. (Doc. 21 at 47.) Specifically, Plaintiffs argue, the record indicates that Project roads will cross 17 streams with BLM Sensitive Species present and will add 19 miles of undetermined roads to the BLM system, in addition to requiring maintenance on an undisclosed number of old and/or impassable system and non-system roads. (Doc. 21 at 48.) Because logging and roadbuilding are the types of activities known to impact bull trout habitat, and because "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers formal consultation," Plaintiffs conclude that a detailed, site-specific review is required to ensure neither bull trout nor bull trout critical habitat is jeopardized. (Doc. 21 at 47) (quoting *Center*, 968 F.3d at 1122–23).)

In response, Federal Defendants argue the agency's tiered analysis shows that the Project will not affect bull trout or the 2.92 miles of bull trout critical habitat in the Project area or downstream. (Doc. 28 at 33.) The Court agrees. First, it appears that Plaintiffs' concerns with respect to roads, particularly the addition of

41

19 miles of "undetermined" roadways and maintenance on an "undisclosed number of old and/or impassable" roads, stem from the same misunderstanding regarding road construction and maintenance addressed at length above. (*See* Doc. 21 at 41–42.)

Second, although the Project area includes only 2.92 miles of BLM-managed designated bull trout critical habitat, BLM000037; BLM002554, the BLM reviewed the effects of 21 miles of new and existing roads in RCAs, 24 miles of haul routes, and 17 stream crossings in riparian habitat. BLM000305. The agency deferred treatments in some areas "due to concerns over road building on excessively steep slopes [and] road building within [RCAs] in Bull Trout Critical Habitat." BLM000282. Addressing concerns about sedimentation, BLM explained that "[t]he majority of these road miles adjacent to occupied sensitive species habitat are on paved routes that have negligible sediment input and are outside BLM management control." *Id.* For areas within BLM authority, the Project will use mitigation measures proven to reduce sedimentation in streams, "such as limiting road use during extended wet periods" and "adding slash filter windrows and/or road adjacent sediment capturing devices like straw waddles." BLM000042.

Furthermore, due to the distance and topography between rivers and treatment areas, any potential sedimentation in streams outside of bull trout critical habitat will not affect bull trout or designated critical habitat in the Clark Fork or

42

Blackfoot Rivers. BLM000034. As explained in the EA, sedimentation and turbidity increases from road maintenance activities have "very localized impacts," with one particular study finding "no noticeable impacts" 800 meters downstream of an activity. BLM000042. And activities adjacent to streams in the Project area are miles from any confluences with either the Clark Fork or Blackfoot Rivers. BLM000306; BLM002254.

Finally, the Project's compliance with the RMP design features means that riparian conditions will be maintained or improved in the Project area. *See* BLM000293; BLM000238–39; BLM000241–42. The RMP design features ensure that "[m]anagement actions within Riparian Conservation Areas will not retard or prevent attainment of RMOs." BLM000238 (DF-14). Specifically, road construction in riparian habitat must ".minimize or avoid adverse effects to aquatic and riparian resources at site-specific reach, and watershed scales," and silvicultural treatments must be applied "in a way that does not retard attainment of RMOs and avoids adverse effects to native fish. *Id.*

The above demonstrates the reasonableness of the BLM's "no effect" determination with respect to bull trout and bull trout critical habitat. Bull trout critical habitat in the Project area is limited, and to the extent it is not, the BLM has taken adequate measures to mitigate any potential effects in line with the RMOs. As discussed, the primary concern with respect to bull trout and bull trout critical

43

habitat is sedimentation; however, because the agency provided a 300-foot buffer zone for stream banks in all critical habitat, that concern is largely obviated. Moreover, concerns with respect to sedimentation are largely confined to spawning and rearing habitat, and the Clark Fork and Blackfoot Rivers provide "foraging, migration, and overwintering habitat." BLM000306. Finally, as discussed, sedimentation has largely localized effects, and Project activities are expected to take place miles from any bull trout critical habitat. The Court therefore concludes that BLM's actions with respect to bull trout satisfies its statutory obligations.

## V.   Whether the Project fails to follow the Missoula RMP Big Game Objectives, in violation of FLMPA

To comply with the FLMPA, the Project must be consistent with the Missoula RMP. *See Western Watersheds v. Salazar*, 843 F. Supp. 2d 1105, 1131 (D. Idaho 2012); 43 C.F.R. §§ 1601.0–5(b), 1610.5–3(a). And in order to be consistent, the action must be "specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan." 43 C.F.R. § 1601.0–5.

Plaintiffs argue that the Project fails to disclose, consider, or comply with the Missoula RMP's standards relating to big game (Doc. 21 at 39), taking specific issue with the EA's alleged failure to address the following four provisions of the Missoula RMP:

- **WL-MA-12** – Across cool/moist habitat type groups, provide hiding and

44

thermal cover habitat components near quality elk summer and fall habitat (such as wallows, mineral licks, corridors, etc.).

- **WL-MA-13** – Across warm/dry habitat type groups, provide areas with dense early to mid-successional conditions on aspects to provide elk thermal and hiding cover near quality elk forage in winter range.

- **WL-MA-14** – Across all habitat type groups, provide mature and late-successional forest components for security habitat near harvest units, parks, meadows, and grasslands.

- **WL-MA-16** – Retain large blocks of big game security habitat.

BLM000533.

However, upon review of the RMP and EA, the Court is assured that the Project sufficiently integrated the Missoula RMP's big game objectives. As an initial matter, FLMPA and its implementing regulations require the BLM to manage lands in compliance with the requirements set forth by the RMP, 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5–3(a). Yet nothing in FLMPA requires the BLM to individually assess each RMP management action in an EA. Indeed, such an endeavor would be contrary to NEPA, which instructs that an EA is to be a concise document not to exceed 75 pages. 42 U.S.C. § 4336. Moreover, the BLM explicitly addressed how each of the proposed alternatives would "affect big game species and their habitat, specifically winter range, disturbance/displacement, and forage availability," BLM000014, and the EA explained the location patterns of big game such as moose, elk, mule deer, white-tailed deer, mountain lion, and black bears in the planning area. *Id.*

45

Additionally, the EA found that the Project's "long-term outcome is expected to improve thermal hiding and feeding cover with mature healthy tree overstories," BLM000125, and that taking no action in the Project area risked an increase in "uncharacteristic wildfires that reduce habitat quality and quantity" for big game across all habitat type groups. BLM000141. Indeed, the Project includes design features to keep big game habitat intact and to maintain wildlife corridors. BLM000664–65. These measures were explained thoroughly by the record and comply with the RMP's direction on big game habitat, consistent with FLMPA's multiple use mandate.

**VI.   Whether the EA and Project BiOp fail to adequately address cumulative effects of known timber projects within or immediately outside the Project area, in violation of NEPA, the ESA, and APA**

### A. NEPA

The record discloses 18 additional actions by adjacent landowners that are either currently occurring or are expected to occur in the Project area; these actions total 4,986 acres of additional logging, thinning, and/or burning by both governmental and private entities. BLM000258. Plaintiffs contend that aside from this general disclosure, BLM failed to provide detailed information regarding the projects and to engage in a meaningful cumulative impact analysis regarding lynx, grizzly bears, and other wildlife. (Doc. 21 at 41.)

Analysis of cumulative effects "is a task assigned to the special competency

of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 413–14 (1976).

Under NEPA's deferential "rule of reason," courts "give considerable deference to

the [agency's] determination of the geographical scope of its cumulative impacts

analysis." *Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 2024 WL

4814553, at *1 (9th Cir. Nov. 18, 2024). "Federal agencies may aggregate

cumulative effects analysis for NEPA purposes." *N. Plains Res. Council, Inc. v.

Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011) (cleaned up). In other

words, an agency may individually discuss a previously approved project, or may

incorporate "the expected impact of such a project into the environmental baseline

against which the incremental impact of a proposed project is measured." *Cascadia

Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1112 (9th Cir. 2015).

Here, the BLM analyzed cumulative effects in Appendix H of the EA,

including 14 projects from the Montana Department of Natural Resources

("Montana DNRC"), three projects from Missoula County, and an estimation of

future work by the United States Forest Service. *See* BLM000258. The BLM

further incorporated the estimated treatment acreage for these projects, and, with

respect to the lynx and grizzly bear, explained how treatments in the Project area

may coexist with other projects and how that might impact species movement on

adjacent public or private lands. BLM000118. The Court finds this analysis

sufficient in light of the deference afforded to the BLM under NEPA. *See Seven*

*Cty. Infrastructure Coal.*, 605 U.S. at 180 (when considering whether an agency's NEPA report complies with the law, a reviewing court should grant "substantial deference" to the agency).

Plaintiffs also fault the BLM for failing to include specific details related to Montana DNRC's "Top Secret" sale and failing to mention the Coyote-Greenough Project in Appendix H of the EA. (Doc. 21 at 42–43.) However, with respect to the Top Secret sale, its acreage is included in Appendix H and incorporated into the EA's analysis; nothing more is required under NEPA. *See Cascadia Wildlands*, 801 F.3d at 1112 ("holding that the aggregation of [past and] future projects can be permissible under NEPA"). And although Plaintiffs are correct in that Appendix H omits mention of Coyote Greenough, NEPA does not require an agency to consider *every* possible project, *Pearson v. U.S. Dept of Transp.*, 2009 WL 464469, at \*4 (D. Or. Feb. 24, 2009), and the Court ultimately defers to the agency's decision to exclude one non-BLM project in the EA's cumulative impact analysis, *See N. Plains Res. Council*, 668 F.3d at 1076 (approving aggregation approach employed by BLM); *Seven Cty. Infrastructure Coal.*, 605 U.S. at 180. Only 800 of the acres subject to treatment under Coyote Greenough are in the planning area, none of which are on BLM lands.

In consideration of the above, the Court concludes that the BLM's cumulative effects analysis satisfied the requirements set forth by NEPA.

**B. ESA**

To comply with the ESA, FWS must "[e]valuate the effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3). And in the context of the ESA, cumulative effects include "those effects that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* § 402.02. Plaintiffs argue that FWS failed to disclose all reasonably foreseeable projects on state land and failed to adequately consider the cumulative impacts from Project activities in combination with all current and reasonably foreseeable future actions occurring in the action area. (Doc. 21 at 44.) As above, it appears Plaintiffs' argument here relates to the Coyote Greenough Project. However, this project was finalized after FWS published its BiOp on November 8, 2022, and is thus post-decisional. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603–04 (9th Cir. 2014). In any event, it is not clear that implementation of the Coyote Greenough was reasonably clear at the time FWS conducted its analysis.

CONCLUSION

Accordingly, for the reasons stated above,

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 20) is DENIED, Federal Defendants' Cross-Motion for Summary Judgment (Doc. 27) is GRANTED, and Plaintiffs' Motion to Supplement is DENIED (Doc. 23).

IT IS FURTHER ORDERED that the judgment shall be entered in favor of

49

Federal Defendants on all counts pled in Plaintiffs' First Amended Complaint

(Doc. 14). The Clerk of Court is directed to close this case.

DATED this 9th day of April, 2026.

Dana L. Christensen, District Judge
United States District Court